IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:

LAS MARTAS, INC.

Debtor

CASE NO. 22-02380 (ESL)

CHAPTER 12

## OPINION AND ORDER

On December 5, 2022, the court entered an *Opinion and Order* directing the Debtor to show cause why confirmation should not be denied pursuant to sections 1225(a)(3, 6) of the Bankruptcy Code, and the case dismissed pursuant to section 1208(c)(5) (dkt #65). The Debtor filed its response on December 19, 2022 (dkt #83). Thereafter, on June 12, 2023, the Debtor filed its *Proposed Findings of Fact and Conclusions of Law* (dkt #137) and Condado 5, LLC ("Condado") filed its *Amended Pre-Trial Report* on June 13, 2023 (dkt #139). An evidentiary hearing was held on June 15, 2023, to consider the following: (i) Motion to Dismiss filed by Condado (dkt #22); Debtor's response (dkt #37); Condado's reply (dkt #47); order to show cause regarding dismissal (dkt #65); and Debtor's response to the order to show cause (dkt #83). For the reasons set forth below, Condado's motion to dismiss is hereby granted.

### Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

### Procedural Background

Las Martas, Inc. filed its third bankruptcy petition under chapter 12 on August 16, 2022. The Debtor had previously filed two-prior bankruptcy petitions under chapter 12. Debtor's first bankruptcy petition was filed on June 21, 2011, it was substantively consolidated on July 11,

2011, with the related cases of Juan Manuel Barreto Genorio (Case No. 11-05236) and JM Dairy Inc. (Case No. 11-05239) (Case No. 11-05237, dkt #20) and dismissed pursuant to 11 U.S.C. §1208(c)(1) and (6), on January 16, 2018 (Case No. 11-05236, dkt #s 386 & 387). On December 14, 2018, the Debtor filed its second bankruptcy petition and the same was dismissed on April 22, 2021, pursuant to 11 U.S.C. §1208(c)(1) and (3). (Case No. 18-07304, dkt #251). This Court's *Opinion and Order* dismissing the second bankruptcy case was appealed to the First Circuit Bankruptcy Appellate Panel which affirmed this Court's decision on April 21, 2022 (Case No. 18-07304, dkts # 275 & 276).

The Debtor in its Schedule A/B- Assets- Real and Personal Property disclosed that the following farm animals had an aggregate value of $136,700: 61 total milking cows @ $1,500 each for a total of $91,500; 5 unbred cows @$1,500 each for a total of $7500; 8 unbred calves @ $1,400 each for a total of $11,200; 12 heifers toreras @$700 each for a total of $8400; 15 horras cows @$1,100 each for a total of $16,500; 3 bulls @ $400 each for a total of $1,200; and 2 toretes [small bull] @ $200 each for a total of $400. (dkt #18, p. 4., item 29). The Debtor also included its milk quota of 58,700 quarts every two (2) weeks with a current value of the Debtor's interest of $117,400.00 as a personal asset (dkt #18, p. 6, item #62). The Debtor in its Schedule D- Creditors Who Have Claims Secured by Property- disclosed that Condado has a claim in the amount of $1,532,855.78 which is a secured with the milk quota (58,700 quarts every 2 weeks) that has a value of $117,400.00 (dkt #18, p. 9, item #2.1).

On September 1, 2022, Condado filed a *Motion to Dismiss* premised upon 11 U.S.C. §1208(c)(1), (9), alleging that the petition was filed in bad faith and the case constitutes a two-party dispute (dkt #22). On October 3, 2022, the Debtor filed its *Response to the Motion to Dismiss* (dkt #37). On October 17, 2022, Condado filed its *Reply to Debtor's Response to Motion to Dismiss* (dkt #47). On November 14, 2022, the Debtor filed its Chapter 12 Plan of Reorganization (dkt #49).

On December 5, 2022, the Court rendered an *Opinion and Order* in which it summarized the positions of the parties as to the motion to dismiss; held certain facts to be supported by the

record and established the applicable legal standard regarding a motion to dismiss a Chapter 12 case. The court ordered the Debtor to show cause as to why confirmation should not be denied pursuant to sections 1225(a)(3, 6) of the Bankruptcy Code and the case dismissed pursuant to section 1208(c)(5). The Court further stated that the future of this case will depend on the timely response by the Debtor. The court cautioned the Debtor that, after considering the Debtor's history of bankruptcy filings, conclusory allegations will not move the court and that feasibility and changed circumstances require supporting documentation. (dkt #65, pgs. 6-7). On December 13, 2022, the Chapter 12 Trustee filed an *Unfavorable Recommendation to Chapter 12 Plan Dated November 14, 2022 (Docket 49)* based upon the following: (i) the plan does not comply with 11 U.S.C. §1225(b)(1) because according to the Debtor's repayment plan schedule it is keeping approximately $5,000 monthly which is not necessary for the operation of the business and which could be used to pay unsecured creditors; (ii) the plan does not comply with 11 U.S.C. §1225(a)(5), (6) because it provides for the bifurcation of the secured claim filed by Condado into secured and unsecured portions. Condado has objected to said treatment. The extent of Condado's security interest over Debtor's assets is currently being litigated. However, if Condado's lien extends further than the milk quota, the Debtor will not be able to make payments under the plan; (iii) the plan is contrary to 28 U.S.C. §586(e)(2) regarding the treatment afforded to the Standing Trustee's Chapter 12 fees; and (iv) the plan fails to state which statute is to be applied to provide interest for the payments to the IRS (dkt #70). On December 19, 2022, Condado filed an *Objection to Confirmation of Chapter 12 Plan of Reorganization Dated November 14, 2022* (dkt #81).

On December 19, 2023, the Debtor filed its *Response to Order to Show Cause* (Dkt #65) (dkt #83). On January 10, 2023, the Debtor filed its *Amended Chapter 12 Plan Dated 1/10/23* in which the proposed treatment for Condado's claim is the following:

"3.6 Class E (Condado 5 Secured Claim). Class E consists of the Secured Claim of Condado 5, LLC. The Secured Claim of Condado 5, LLC, shall be bifurcated into 3 components and treated as follows:

E-1 The claim is secured by a prepetition receivable from Suiza Dairy, Inc., in the amount of $3,000. Upon the Effective Date[1] of the Plan, if not paid sooner, Suiza Dairy shall pay $3000 to Condado 5 from the receivables of the Debtor that it is holding. If the funds are paid to the Debtor or into escrow prior to that, then the payment shall be made from that source. Condado shall retain its lien on the prepetition receivable to the extent thereof, until paid.

E-2 The claim is otherwise secured as to the Debtor by Debtor's ORIL milk quota of 58,700 quarts/ 2 weeks. The secured claim as to the Milk Quota shall be valued at $5/quart/ 2 weeks, $293,500. Condado 5 shall be paid by the Debtor directly 8.5% interest only on the $293,500 for 6 months ($2,078.96/ month) from the Effective Date, and then $293,500 amortized at 8.5% p.a. by the Debtor directly in equal monthly installments of $4,224.09 over 8 years (96 months) from 6 months after the Effective Date, and shall retain its lien until paid as provided in this Paragraph E-2. Should Suiza Dairy Inc. and Condado 5 agree, these payments may be made in weekly installments directly from Debtor's receivables due from Suiza Dairy.

E-3 The balance of the claim of Condado 5 is unsecured under 11 U.S.C. [§]506 and shall be treated for all purposes as a general unsecured claim.

As it[s] claim is not secured by post-petition receivables or otherwise by the proceeds of post-petition milk sales, upon confirmation Condado 5 will release its claim to a lien on such proceeds and Suiza Dairy shall turn them over to the Debtor." (dkt #93, pgs. 5-6).

On January 23, 2023, Condado filed its Objection to Confirmation of Amended Chapter 12 Plan of Reorganization Dated January 10, 2023 by which it argues that: (i) the amended plan does not comply with 11 U.S.C. §1225(a)(5)(B); (ii) the amended plan is not feasible and fails to comply with 11 U.S.C. §1225(a)(6) due to the following: (a) the property where the Debtor's dairy farm operates does not belong to the Debtor, but to the Debtor's principal and his ex-spouse. There is a pending foreclosure proceeding as to this property. Once Condado forecloses on the property, the Debtor will not be able to operate its dairy farm and no alternate plan has been provided; (b) the feasibility of the amended plan depends upon the final adjudication of whether Condado's milk quota extends to the milk produced and sold to milk processing plants under Debtor's bi-weekly milk quota and the proceeds generated thereunder; (c) there are no significant changes in circumstances from the prior bankruptcy cases as compared to the instant case. The Debtor is now in a more precarious financial condition given that it has increased its liabilities and the value of its assets have decreased significantly from the filing of the previous case on

---

[1] Pursuant to section 1.27 of the amended plan the "Effective Date" "means the first Business Day after 14 days after entry of the Confirmation Order is then in effect, in which case it shall be the first Business Day after 14 days after the stay terminates." (dkt #93, p. 2).

December 14, 2018; (d) the monthly operating report for August 2022 discloses a negative cash balance and the monthly operating report for September 2022 shows a net cash balance of $771.32 and the December 2022 monthly operating report reflects a net cash balance of $610.36; (iii) the amended plan does not comply with the contents of the plan requirement under 11 U.S.C. §§1222(c) and 1222(b)(9) and 1225(a)(5)(A), (B) and (C); and (iv) the amended plan fails to comply with the feasibility requirements pursuant to 11 U.S.C. §1225(a)(4) because it fails to include financial projections to establish feasibility and also lacks a liquidation analysis (dkt #95). On January 26, 2023, the Chapter 12 Trustee filed its *Position Regarding the Confirmation of the Amended Chapter 12 Plan Dated January 10. 2023 (dkt #93)* by which it discloses that: (i) it has a plan base of $108,000; (ii) it provides for the payment of attorney's fees; the payment in full of priority claims filed by the Internal Revenue Service and the Department of the Treasury; provides for direct payments to secured debts with the Small Business Administration and Condado. The amended plan provides for a bifurcation of Condado's claim by which $293,500 will be treated as secured and the remaining balance will be considered general unsecured which would be paid pro-rata and would receive approximately $65,660.09 or a five percent distribution; and (iii) the liquidation value has been estimated at $38,660 without deducting priority claims. The Trustee's position is that in principle he has no objection to the confirmation of the amended plan because it complies with 11 U.S.C. §§1222 and 1225. Notwithstanding, a final determination of compliance with the confirmation requirements is subject to the resolution of the following matters: (i) the extent of Condado's security interest over Debtor's assets is currently being litigated. If Condado's lien extends beyond the Debtor's milk quota to post-petition milk production, then the Debtor will not be able to make plan payments; and (ii) the outcome of the investigation regarding the $37,101.00 the Debtor received pre-petition from a USDA grant may affect the plan confirmation. Resolution of these two matters needs to be resolved favorably for the amended plan to be confirmed, if not the amended plan cannot be confirmed (dkt #96). On February 10, 2023, the Chapter 12 Trustee filed his *Report Re Investigation Regarding Condado 5, LLC Concerns Re: Debtor's Misuse of Funds Received From USDA* in which the Trustee

concluded the following: (i) Debtor improperly used funds received in August 2022 from the Natural Resources Conservation Service, U.S. Department of Agriculture ("NRCS-USDA") Program; (ii) seeking to correct the situation, the Debtor in November 2022 was able to obtain funds to replace the misused funds and started the project funded by the NRCS- USDA Program. Completion of the project is expected by March 2023; (iii) the NCRS-USDA Program, under its discretion under the contract decided not to sanction the Debtor for the misuse of funds and to continue with the contract as planned; and (iv) the Debtor's improper use of the funds received under the NRCS-USDA Program would have no adverse impact over Debtor's reorganization under Chapter 12 (dkt #100).

On February 15, 2023, this Court rendered an *Opinion and Order* in which Condado's request to prohibit the Debtor's use of cash collateral resulting from the post-petition sale of milk was denied (dkt #102). Also on February 15, 2023, Condado filed its *Notice of Appeal and Statement of Election to District Court* (dkt #103). Thereafter, on June 12, 2023, the Debtor filed its *Proposed Findings of Fact and Conclusions of Law* (dkt #137). On June 13, 2023, Condado filed its *Amended Pre-Trial Report* (dkt #139). An evidentiary hearing was held on June 15, 2023, as to Condado's motion to dismiss and the Debtor's opposition and regarding Debtor's response to the order to show cause (dkt #143). The June 15, 2023, Minutes refenced herein, summarize the testimonies of Mr. Francisco de Armas as Condado's witness to Condado and of Mr. Juan M. Barreto, the Debtor's president and owner.

The Court in its December 5, 2022, *Opinion and Order* discussed the Debtor's factual scenario citing in part the minutes of the hearing held on September 16, 2022 (dkt #34) as follows:

"[t]he factual allegations in Condado's motion to dismiss are substantially supported by the record, irrespective of the ultimate legal consequences. On August 16, 2022, the Debtor filed the instant third Chapter 12 bankruptcy petition. The history related in the motion to dismiss is summarized below.

On or around January 12, 2005, Banco Popular de Puerto Rico ("BPPR"), predecessor in interest of Condado, extended to the Debtor a credit facility in the amount of $1,850,000.00 (the "Loan"). Debtor's principals are guarantors of the loan. The loan matured in 2015.

On June 21, 2011, the Debtor filed its first Chapter 12 petition, Bankr. Case No. 11-05237-ESL, which was substantively consolidated with Bankr. Case No. 11-05236-ESL, filed by Juan M. Barreto Ginorio, one of the Debtor's guarantors. These previously consolidated cases were dismissed on January 16, 2018, the Debtor filed its second Chapter 12 petition (Case No. 18-073104-ESL). On April 22, 2021, the case was dismissed pursuant to 11 U.S.C. §1208(c)(1) for unreasonable delay prejudicial to creditors, and failure to timely file a confirmable plan under 11 U.S.C. §1208(c)(3). See Opinion and Order, 2021 Bankr. LEXIS 1075, 2021 WL 8200008 (Bankr. D.P.R. Apr. 22, 2021). The Opinion and Order was appealed to the Bankruptcy Appellate Panel for the First Circuit (BAP 1st Cir. No. 22-0017), which affirmed the dismissal through an Opinion and Order issued on April 21, 2022. See Vaqueria Las Martas, Inc. v. Condado 5, LLC (In re Vaqueria Las Martas, Inc.), 638 B.R. 482 (B.A.P. 1st Cir. 2022).

On May 28, 2021, Condado filed a Foreclosure Complaint with the PR Court of First Instance, Superior Court of Arecibo (the "PR Court of First Instance"), Case No. AR2021CV00693 (the "Foreclosure Case") against the Debtor, the Debtor's principal and co-guarantor (Mr. Juan Manuel Barreto Ginorio), his former spouse and co-guarantor (Ms. Maria Elena Hernandez Ruiz) and JM Dairy, Inc.

The Debtor's factual exposition is primarily based on conclusory allegations with no supporting documentation."

"'[t]he Court expressed concern as to pending motion to dismiss in light of the prior history of the debtor, particularly the litigious experience over the cash collateral dispute since the Debtor's first petition in 2011. The loan is fully matured, the scheduled secured claims far exceed the scheduled assets, and the claims filed show substantial indebtedness in spite of the time that has transpired. Therefore, the Debtors appear to face a challenge to show changed conditions and a real possibility of having a confirmed Chapter 12 plan. In the prior Chapter 12 petition (Case number 18-0734), the Court ruled in favor of the Debtor on the cash collateral issue based on the facts at the time; however, the case was dismissed, upon the Chapter 12 Trustee's request, for unreasonable delay and failure to present a confirmable Chapter 12 plan.'"

"The monthly operations report corresponding to the month of August 2022, filed on October 11, 2022 (dkt #42) shows a negative cash flow. The monthly operations report corresponding to the month of September 2022, filed on October 27, 2022 (dkt #48), shows a net cash flow of $771.32.

As of this date, six (6) proof of claims ("POC") have been filed, none of which has been objected. Thus, they are deemed allowed. 11 U.S.C. §502(a). These are: POC 1-1 by Condado 5, LLC, secured in the amount of $1,532,855.[7]8; POC 2-1 by Autoridad de Tierras de Puerto Rico (Puerto Rico Land Authority) in the amount of $18,912.00 for lease payment arrears; POC 3-1 by the Small Business Administration, secured in the amount of [$]106,236.40; POC 4-1 by LUMA Energy in the amount of $39,510.60, for past due electricity payments; POC 5-2 by the Internal Revenue Service (IRS) in the amount of $35,493.69, of which $7,581.78 is secured and $22,148.16 is claimed as a priority

pursuant to 11 U.S.C. §507(a); and POC 6-1 by the Puerto Rico Department of Labor, in the amount of $8,249.43, of which $1,746.28 is claimed as a priority. In its previous case, 18-07304, seven POC's were filed, essentially the same creditors as in the present case."

(dkt #65, pgs. 2-4).

### *Issues*

The issues before the Court premised upon Condado's motion to dismiss are the following: (i) whether there is cause to dismiss pursuant to 11 U.S.C. §1208(c)(9) because there is a continuing loss to or diminution of the estate and no reasonable likelihood of reorganization; (ii) whether there is cause to dismiss based upon the Debtor's alleged lack of good faith in the filing of the bankruptcy petition under the totality of the circumstances. The last issue which was prompted by the Court in its *Opinion and Order* is whether there is cause to dismiss the case pursuant to section 1208(c)(5) and whether confirmation should be denied pursuant to sections 1225(a)(3, 6).

### **Position of the Parties**

### *Condado*

Condado argues that there is cause to dismiss the instant case because there is no reasonable likelihood of reorganization pursuant to 11 U.S.C. §1208(c)(9) based on the following: (i) both the Bankruptcy Court and the Bankruptcy Appellate Panel for the First Circuit found that "with the passage of time, the Debtor's livestock decreased by 50%, thus evidencing a marked diminution in the Debtor's assets. This in turn, caused raw milk production to decrease dramatically, making the feasibility of any plan even less likely. In re Vaqueria Las Martas, Inc., 638 B.R. at 498." The situation has not changed since the dismissal of the second bankruptcy case and the filing of the Foreclosure Case on May 28, 2021; (ii) the real property where the farming operation takes place is not part of the bankruptcy estate, thus once Condado forecloses on this property, the Debtor will not be able to operate its dairy farm; (iii) the Debtor is now in a more precarious financial condition compared to its previous bankruptcy filed on December 14, 2018

to the filing of the instant petition, since the Debtor has lost $672,333.84 in the value of its property and has increased its total liabilities in the amount of $370,110.79 (Case No. 18-07304, dkt #1, p. 9, ¶ 1c & 4; p. 2, ¶ 4); (iv) the Debtor has been generating less in gross revenue on a consistent basis since the year 2016 according to the Debtor's Statement of Financial Affairs for both the second and the instant case. Debtor's reported gross revenues are the following: (1) $316,445 for the year 2016; (2) $146,309 for the year 2017; (3) $123,218 for the year 2020; and (4) $125,250.00 for the year 2021 (Case No. 18-07304, dkt #26, p. 17, ¶ 1) (dkt #47, p. 8, ¶23; and (v) the loan matured on January 12, 2015, and has been past due and payable since then. This third bankruptcy case translates into continuing delay, increasing costs and attorney's fees and no authorization to use cash collateral which results in Debtor having no source of sustainable income.

Condado further argues that there is also cause to dismiss the instant case for bad faith and unusual delay and that the case constitutes a two-party dispute. In the instant case, Debtor's bad faith in the third bankruptcy petition is evinced by the following: (i) the Debtor has a history of prior filings, and there is no significant change in circumstances or legitimate bankruptcy purpose; (ii) this Court in dismissing the Debtor's second bankruptcy case concluded the following:

> [h]as the Debtor been afforded a reasonable time to have a Chapter 12 plan confirmed? Definitely so, over 30 months is a reasonable time. Has the Debtor caused the delay? The answer is yes. Condado has asserted its rights. The court denied the prior motion to dismiss filed by Condado and declined to find that the milk was part of its collateral. However, the Debtor has not taken the necessary actions to present a confirmable Chapter 12 plan. Consequently, it has incurred in unreasonable delay prejudicial to creditors." In re Vaqueria Las Martas, Inc., 2021 Bankr. LEXIS 1075, at *19, 2021 WL 8200008, at *7 (Bankr. D.P.R. 2021).

(iii) the Debtor appealed this Court's dismissal order to the Bankruptcy Appellate Panel for the First Circuit which affirmed this Court's Opinion and Order and concluded that:

> "[t]he Debtor's attempt to blame the bankruptcy court for the subject delay does not alter the outcome of our analysis. The Debtor overlooks its own delay in filing the plan beyond the period prescribed by §1221, its failure to file an amended plan after the denial of confirmation or to seek an extension of time to do so, and the irregular filing of operating reports." Vaqueria Las Martas, Inc. v. Condado 5, LLC (In re Vaqueria Las Martas, Inc.), 638 B.R. 482, 498 (B.A.P. 1st Cir. 2022).

(iii) given the Debtor's previous bankruptcy patters, it is reasonable to conclude that this third bankruptcy petition is motivated by a desire to continue stalling, delaying and/or circumventing the Foreclosure Case than by a legitimate *bona fide* effort to reorganize; (iii) the loan has been past due and payable since January 12, 2015; (iv) there is a strong public policy against the "revolving door approach to bankruptcy" See <u>In re Mangual</u>, 2010 Bankr. LEXIS 4688, at *6 (Bankr. D.P.R. 2010) (courts "may dismiss with prejudice… to prevent a revolving door approach to bankruptcy"); (v) the passage of time leading up to this third bankruptcy case further elongates the Debtor's default on a loan that has been past due and payable for over [8] years and a half; and (vi) the Debtor's bad faith is targeted solely at Condado. Its pattern of conduct is aimed at thwarting Condado's Foreclosure Case and collection efforts and constitutes both bad faith and a two-party dispute. (dkt #139).

*Debtor*

The Debtor contends that its circumstances have changed significantly since the previous case due mostly to an increase in the number of milking cows which has resulted in an increase in the level of milk production. The Debtor asserts that: (i) it has more cows and thus additional production capacity. It had 45 milking cows at the time of the 2018 bankruptcy petition, and it had 61 milking cows at the time the present case was filed. It also has another 15 milking cows which are not currently producing milk, but which will cycle into production. The additional 34 cows should add approximately 50% more production in 30-60 days; (ii) according to Mr. Barreto's declaration (dkt #83-1), as of December 19, 2022, the Debtor had 59 cows in production, as compared to 39-42 in the year 2018; (ii) in the year 2018 the Debtor's biweekly milk production averaged under 6,000 liters; in the year 2022 it averaged $9,700 liters, an increase of over 50%. "Milk proceeds were under $4000/ 2 weeks in 2018; in 2022, they have averaged over $8000, more than double;" (iii) "[o]nce Debtor receives the milk proceeds, Debtor's revenue will be in excess of $20,000/ month (as shown on the filed MORs). That will increase by about

50% when the 34 new cows go into production; (iv) after a six month window of interest only payments to Condado, the amended plan provides for payments to Condado of $4,149 per month which may have to increase given that interest rates have risen since the plan was filed; (v) the Debtor has been unable to pay its principal, Mr. Juan Barreto its full salary nor the rent for the farm; and (vi) if it buys more cows and better feed, the Debtor will be able to generate the revenues shown on the budget attached to Exhibit B to Mr. Barreto's Declaration which would increase payments to unsecured creditors; and (vii) the value of the milk quotas has declined significantly, which reduces the value of Condado's security interest and frees up funds to pay other creditors. "This decline in asset value benefits the Debtor because that asset is fully encumbered and thus the value of Condado's secured claim that Debtor has to pay has declined, freeing up revenue (unencumbered by Condado's lien) for operations and to pay other creditors." (dkt #137, p. 4, ¶ 13).

The Debtor avers that there is no cause to dismiss the present bankruptcy case because: (i) there is no "cause" based on loss or diminution of assets since the case was filed, given that the Debtor is operating profitably once the payments to Condado/ the Court's escrow are factored into the Debtor's revenue (dkt a#137, p. 5, ¶ 4); (ii) Chapter 12 has no good faith filing requirement, unlike Chapter 13. There is no counterpart to 11 U.S.C. §1325(a)(7); (iii) Condado cannot show bad faith under any of the factors listed in In re Sullivan, 326 B.R. 204, 12 (B.A.P. 1st Cir. 2005), given the significant changes in circumstances. The Debtor contends that the Debtor's have a legitimate bankruptcy purpose which is to reorganize by using the funds that Condado has taken to pay its creditors. The Debtor avers that it filed for bankruptcy protection to stop diverting all funds to Condado and reorganize by paying Condado the value of its secured claim, and using the remaining funds to repay other creditors.

Regarding Condado's allegation that this is a two-party dispute, the Debtor argues that the claims filed are similar to the prior case, although some claims have been satisfied or reduced (including Condado). The only significant new claim is the COVID EIDL SBA loan, which is

payable over 30 years at 3.75% ($526 per month) by its terms. Moreover, the Debtor's schedules disclose that there are many substantial creditors.

As to the feasibility of the amended plan, the Debtor contends that: (i) it has filed a confirmable plan and there will be no unreasonable delay to the creditors. Any delay in the prior case was caused by Condado which continued to take the Debtor's funds without a valid lien on them as the Court has held in both cases; (ii) the market for milk quotas has declined since the previous bankruptcy which benefits the Debtor and its unsecured creditors. The decline in market value also diminishes Condado's security interest pursuant to 11 U.S.C. §506(a), and thus the Debtor would need to pay less to Condado to satisfy 11 U.S.C. §1225(a)(5); (iii) if Condado does not have a security interest in the milk produced by Debtor's cows or on the post-petition proceeds/ accounts receivables generated as has been previously held, then the plan is feasible and may be confirmed; and (iii) if Condado prevails on the cash collateral issue, the Debtor would not be able to continue operating while paying Condado $12,000 per month. Whether the plan is confirmable depends entirely on the outcome of this issue.

### Applicable Law & Analysis

*Dismissal for Cause pursuant to 11 U.S.C. §1208(c)(9), (5) and bad faith*

Section 1208(c) provides ten specific grounds that constitute cause for dismissal of a chapter 12 case. Notwithstanding, this list is not exhaustive, meaning there are other factors that may be considered as a cause for dismissal, such as lack of good faith in the filing of the petition. See Richard Levin & Henry J. Sommer, 8 Collier on Bankruptcy ¶ 1208.03 (16th ed. 2023). "Creditors bear the burden of establishing that cause exists to dismiss a chapter 12 case. 'Ultimately, [t]he decision to dismiss a Chapter 12 petition is within the sound discretion of the bankruptcy court." Vaqueria Las Martas, Inc. v. Condado 5, LLC (In re Vaqueria Las Martas, Inc.), 638 B.R. 482 (B.A.P. 1st Cir. 2022) (citations omitted).

"The provisions of section 1208(c) are similar to sections 1112(b) and 1307(c) which govern dismissal of chapter 11 and chapter 13 cases, respectively. Unlike those two sections, section 1208(c) only authorizes dismissal of the case." Richard Levin & Henry J. Sommer, 8 Collier on Bankruptcy ¶ 1208.03 (16th ed. 2023).

Section 1208(c) provides in pertinent part that, "[o]on request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause, including--

"(5) denial of confirmation of a plan under section 1225 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;
(9) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §1208(c)(5), (9).

The Court will first address whether there is cause to dismiss pursuant to section 1208(c)(9) and will employ the standard used under section 1112(b)(4)(A), which provides cause for dismissal in a Chapter 11 for "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §1112(b)(4)(A). This particular "cause" consists of two (2) requirements which must be satisfied. "First, it tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values. Second, it tests whether there is any reasonable likelihood that the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time. Both tests must be satisfied in order for cause to exist under this subparagraph to dismiss or convert the case under section 1112(b)(4)(A)." Richard Levin & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[6][a] (16th ed. 2023). "Negative cash flow means that the estate's current liabilities are increasingly more rapidly than cash is available to pay as due. The result is dwindling liquidity, or illiquidity resulting in unpaid post-petition debts which usually constitute administrative

expenses that will take priority over prepetition claims" Id. at ¶1112.04[6][a][i]; See also In re Horned Dorset Primavera, 606 B.R. 117, 149 (Bankr. D.P.R. 2019). Likelihood of rehabilitation under section 1112(b)(4)(A) is different from a reorganization, because the focus is on "…whether the debtor's business prospects justify continuance of the reorganization effort" and whether the business operation may be reestablished, taking out the liquidation scenario which is an option under a plan of reorganization. Id. at ¶1112.04[6][a][ii].

*First Bankruptcy Petition*

The Debtor's first bankruptcy petition was administratively consolidated on July 11, 2011, with the bankruptcy petitions of the Debtor's principal, Juan Manuel Barreto Ginorio and JM Dairy, Inc. on (Lead Case No. 11-05236, dkt # 22). Mr. Barreto's Schedule A- Real Property disclosed three real estate properties with a total current value of $1,540,000 and which were listed as follows: (i) the lot of land with a dairy farm in Hatillo with a value of $1,100,000 and the amount of Banco Popular de Puerto Rico's ("BPPR") claim was in the amount of $1,475,461 of which $1,100,000 was listed as secured and the remainder was an unsecured claim in the amount of $375,461; (ii) a residential house in Arecibo with a current value of $140,000; and (iii) a two story residential house located in Arecibo with a listed current value of $300,000 (Lead Case 11-05236, dkt #1, pgs. 12 & 17). On September 29, 2011, BPPR filed proof of claim #7-1 in the amount of $1,760, 240.03 for monies loaned which were secured by real estate, accounts receivables, milk quota and assignment of payments. This claim is for the loan that was originated on January 12, 2005, in the original amount of $1,850,000. On July 30, 2013, a *Transfer of Claim Other Than for Security* was filed informing that BPPR's claim had been transferred to PR Asset Portfolio 2013-1 International, LLC ("PRAPI") (Lead Case 11-05236, dkt #269). Thereafter, on October 11, 2017, a second *Transfer of Claim Other Than for Security* was filed informing PR

Asset Portfolio 2013-1 International LLC's claim had been transferred to Condado 5, LLC (Lead Case 11-05236, dkt #380). The Debtor did not file an objection to proof of claim number 7-1 in this case.

Vaqueria Las Martas, Inc.'s ("VLM") Schedule B- Personal Property included the milk quota with a current value of $1,232,700 (58,700 @ 21) and farm animals with a current value of $575,800 which were comprised of the following: (i) 173 cows @$2,200 ($380,600); (ii) 76 resting cows @ $2,000 ($167,200), (iii) 4 bulls @$1,000 ($4,000); (iv) 15 calves @ $1,600 ($24,000) (Lead Case 11-05237, dkt #1, p.12). VLM's Schedule D-Creditors Holding Secured Claims disclosed BPPR's secured claim in the amount of $1,475,461 (Lead Case 11-05237, dkt #1, p. 15). As part of the supporting documentation for the motion to use cash collateral, VLM's included an Exhibit of Summary Production from January 5, 2011, until May 11, 2011, which included the bi-weekly amount of production which ranged from 24,642 liters out of 58,700 liters or 41.98% to 29,063 out of 58,700 or 49.51% of the milk quota being produced (Lead Case 11-05237, dkt #6-1, p. 15).

The first monthly operating report for the consolidated Debtor for the short period of June 24, 2011, to July 11, 2011, disclosed that VLM produced as of June 24, 2011, 22,121 liters at 85 cents, which resulted in $18,803 and as of July 8, 2011, produced 22,819 liters at 85 cents which resulted in $19,396 of income, totaling $38,199 in income from the milk production. During this short period VLM received a reimbursement of $19,493 and operational expenses that totaled $40,566. The Debtor reported a net income for VLM of approximately $17,126 for this month. The court notes that the Debtor reports $0 for utilities expenses; $915 for gasoline and diesel expenses; $500 paid on the farm and land lease; $2,601 paid in wages; and $972 for personal salary (Case No. 11-05236, dkt #30, p. 3). The monthly operating report for the period of July 12 to August 15, 2011, disclosed total sales for VLM in the amount of $53,894 and total operating

costs in the amount of $59,566. The court notes that the Debtor reports $0 for utilities expense; $2,672 for gasoline and diesel expense; $3,500 paid on the farm and land lease; $3,876 paid in wages; and $873 for personal salary (Lead Case 11-05236, dkt #50-1, p. 1).

The monthly operating report for the consolidated Debtor for the month of July 2012, disclosed that VLM had 137 milking cows and it produced 16 liters per cow per day. At the time VLM was utilizing 54% of its milk quota. VLM produced as of July 6, 2012, 16,031 liters at 85 cents, which resulted in $13,626.06; as of July 20, 2012, it produced 30,711 liters at 85 cents which resulted in $26,155.35; and as of July 24, 2012, produced 10,042 liters at 85 cents which generated $8,535.92 of income, totaling $48,317.33 in income from the milk production. During this month VLM received a reimbursement of $6,550 from VTM, Inc. and operational expenses that totaled $61,275.22. The Debtor reported a net income for VLM of $108.11 for this month. The court notes that the Debtor reports $0 for utilities expenses; $1,792 for fuel for expense; $0 paid on the farm and land lease; $3,552 paid in wages; and $400 for personal salary (Case No. 11-05236, dkt #248-1, p. 1)

On August 30, 2012, the Debtor's Third Amended Chapter 12 Plan Dated July 10, 2012, was confirmed (Lead Case 11-05236, dkt #252). On August 3, 2016, the Debtor filed an Amended Post-Conformation Plan Dated July 10, 2016, which was confirmed on September 1, 2016 (Lead Case 11-05236, dkts # 348-1 & 350). The payment plan structure for PR Asset Portfolio 2013-1 International LLC's secured claim at a 4.75% interest rate was the following: (i) a monthly payment of $7,400 for 6 months; a monthly payment of $8,500 for 18 months; (iii) $9,000 monthly payment plan for three years; (iv) pursuant to the Court approved Stipulation (dkt #331), the Debtor shall cure the plan arrears with PRAPI by making consecutive monthly additional payments in the amount of $1,052.45 for ten (10) months commencing on April 2016; (v) a $13,000 monthly payment for 5 years; and (vi) a balloon payment on August 15, 2022 which may

be approximately $1,231,752.55. (Lead Case 11-05236, dkt #348-1, pgs. 12-13). On November 29, 2017, the Chapter 12 Trustee filed a *Motion to Dismiss* pursuant to 11 U.S.C. §1208(c)(6) because the Debtors were in a material default with the terms of the confirmed plan equal to $80,524.05 and sixty (60) months have already lapsed since the effective date of the plan; hence the plan repayment period can no longer be extended in conformity with 11 U.S.C. §1222(c). The case was dismissed on January 16, 2018 "upon the Chapter 12 Trustee's motion to dismiss for "material default" with respect to the terms of the confirmed plan" (Lead Case 11-05236, dkts #386 & 387).

*Second Bankruptcy Petition*

The Debtor's second bankruptcy petition was filed on December 14, 2018. In the second bankruptcy petition filed by VLM, in its second amended Schedule A/B: Assets – Real and Personal Property disclosed the milk quota with a net book value or recent cost of $704,400 (58,700 @ 12). The Debtor disclosed that the aggregate value of the collateral that secures Condado's claim is $1,017,400. However, VLM has not found existence of a valid and unexpired UCC over the milk quota. If such is the case, then the aggregate value of Condado's collateral would be reduced by $704,400 to $313,000 secured by real properties of third-party guarantors and not this Debtor (Case No. 18-07304, dkt #34, pgs. 3-4). The Debtor in its amended Schedule A/B also disclosed that it had the following farm animals with a current value of $34,600 which included the following: (i) 13 milking cows @$1,200 each ($15,600); (ii) 15 unbred cows @$1,000 each ($15,000); (iii) 13 heifers @ $200 each ($2,600); (iv) 2 bulls @ $500 each ($1,000); (v) 2 toretes @ $200 each ($400) (Case No. 18-07304, dkt #34, p. 4). The Debtor's amended Schedule D-Creditors Holding Secured Claims disclosed Condado's secured claim in the amount of $1,619,500.29 and the value of the collateral that supports this claim is in the amount of $1,017,400 which consists of the milk quota of 58,700 litres @ $12 = $704,400 plus

-17-

27.4842 acres ("cuerdas") of a third party valued at $54,940 in addition to structures and equipment $53,060 plus residence valued at $205,000 (Lead Case 18-07304, dkt #26, p. 8).

On February 19, 2019, Condado filed proof of claim 6-1 in the amount of $1,626,362.59 and it listed the claim in its entirety as secured by mortgage notes, Deed and others. It disclosed that the annual interest rate at the time the petition was filed was 10 1/8 %. The Court notes that the secured creditor's claim in the first bankruptcy petition in the year 2011 was in the amount of $1,760,240.03 and more than seven (7) years thereafter, the secured creditor's claim has decreased by approximately $133,877. The Debtor's December 2018 monthly operating report was filed on April 15, 2019, and the same disclosed that the Debtor had 41 milking cows which averaged 9.06 liters per day per cow and that the Debtor was utilizing 8.86% of its milk quota. As of December 12, 2018, the Debtor produced 5,150 liters at 79.99 cents, which resulted in $4,119.97 and as of December 26, 2018, it produced 5,253 liters at 76.511 cents which resulted in $4,022.32. These monies ($8,142.29) were all received by Condado. During this period the operational expenses were in the amount of $5,468.59. During this period, the Debtor received $5,620 from a family member and $1,800 from JM Dairy, Inc. The Debtor reported a net income of $48.15 for this month. The court notes that the Debtor reports $0 for utilities expenses; $0 paid on the farm lease to Juan Manuel Barreto and $1,120 paid in wages (Lead Case 18-7304, dkt #67). The Debtor's December 2019 monthly operating report was filed on January 22, 2020, disclosed that the Debtor had 26 milking cows which averaged 12.82 liters per day per cow and that the Debtor was utilizing 7.95% of its milk quota. As of December 11, 2019, the Debtor produced 4,392 liters at 82.2 cents, which resulted in $3,610.22 and as of December 25, 2019, 4,940 liters at 82.20 cents were produced which resulted in $4,060.68. These monies ($7,670.88) were all received by Condado. The Debtor also disclosed income from the sale of hay for this month in the amount of $4,540.00. During this period the operational expenses were in the amount of

$5,122.63. The Debtor reported a net income of $49.84 for this month. The court notes that the Debtor reports $0 for utilities expenses; $0 paid on the farm lease to Juan Manuel Barreto and $600 paid in wages (Lead Case 18-7304, dkt #117, p. 1).

The Debtor's December 2020 monthly operating report filed on January 22, 2021, disclosed that the Debtor had 20 milking cows which averaged 11.94 liters per day per cow and that the Debtor was utilizing 5.7% of its milk quota. As of December 11, 2019, the Debtor produced 3,255 liters at 82.11 cents, which resulted in $2,672.71 and as of December 25, 2019, 3,433 liters at 82.09 cents were produced which resulted in $2,818.27. These monies ($5,490.98) were all received by Condado. The Debtor informed that he had been forced to dry cows because he had no use of cash collateral. The Debtor also disclosed income from the sale of hay for this month in the amount of $3700.00. During this period the operational expenses were in the amount of $3,792.21. The Debtor reported a net income of $103.12 for this month. The court notes that the Debtor reports $0 for utilities expenses; $0 paid on the farm lease to Juan Manuel Barreto and $800 paid in wages (Lead Case 18-7304, dkt #207, p. 1).

The Debtor's second bankruptcy petition was dismissed by an *Opinion and Order* rendered on April 22, 2021, in which the court granted Condado's motion to dismiss pursuant to section 1208(c)(1) for unreasonable delay prejudicial to creditors and Debtor's failure to file a timely confirmable plan after thirty (30) months under section 1208(c)(3) (Lead Case 18-07304, dkt #251). This Opinion and Order was appealed to the Bankruptcy Appellate Panel for the First Circuit which affirmed the same on April 21, 2022 (Lead Case 18-07304, dkts # 275 & 276). On July 28, 2022, the Order discharging the Chapter 12 Trustee and closing the estate was entered (Lead Case 18-07304, dkt #284).

*Third Bankruptcy Petition*

Less than three weeks after the closing of the estate in the previous case, the Debtor filed its third bankruptcy petition on August 16, 2022. On August 23, 2022, Condado filed its proof of claim number 1-1 as fully secured by the milk quota, accounts receivables per UCCs, in the amount of $1,532,855.78. It also disclosed that it had a fixed annual interest rate of 10 1/8 %.

The Debtor in its Schedule A/B: Assets- Real and Personal Property included the milk quota (58,700 liters every 2 weeks) as having a current value of $117,400. (dkt #18, p. 6). The Court notes that the Debtor did not include the value per quota, but by a simple math calculation, it would have to be 58,700 liters @ $2. The Debtor also disclosed that it had the following farm animals with a current value of $136,700 which included the following: (i) 61 milking cows @$1,500 each ($91,500); (ii) 5 unbred cows @$1,500 each ($7,500); (iii) 8 unbred calves @ $1,400 each ($11,200) (iv) 12 heifers Toreras @ $700 each ($8,400); (v) 15 Horras cows @ $1,100 each ($16,500); (vi) 3 bulls @ $400 each ($1,200); (vii) 2 toretes @ $200 each ($400) (dkt #18, p. 4). The Debtor's Schedule D- Creditors Holding Secured Claims listed the following claims: (i) Condado's claim on the Debtor's milk quota, accounts receivables in the amount of $1,532,855.78 which is secured by collateral that has a value of $117,400; (ii) SBA claim in the amount of $104,900 which is secured by personal property, excluding the milk quota and the titled vehicles, which is valued at $200,000 (dkt #18, p. 9).

The Debtor's August 2022 monthly operating report filed on October 11, 2022, disclosed that the Debtor had 59 milking cows which averaged 13 liters per day per cow and that the Debtor was utilizing 18.16% of its milk quota. The Debtor produced for Suiza 17,345 liters at 90.7 cents, which resulted in $15,731.92 and it produced for Indulac, 3,977 liters at 53.395 cents which resulted in $2,123.52 of income. The Debtor also disclosed income from the sale of culled cows and male calves in the amount of $1,380 and $2,025 for the sale of hay. Additional items which

were reported as income were the following: (i) NRCS roof and cover 50% advanced payment in the amount of $37,101, and (ii) money reimbursed by attorney LA Morales in the amount of $20,000. During this period the operational expenses were in the amount of $61,104.94 but included $20,000 paid for professional fees. The Debtor reported a net income of $16.57 for this month. The court notes that the Debtor reports $0 for utilities expenses; $0 paid on the farm lease to Juan Manuel Barreto and $2,120 paid in wages; $13,000 was reported as an obligation paid to Condado through milk assignments; and $3,000 was paid to Juan I. Barreto for money loaned for feed (dkt #42, p. 12).

The Debtor's December 2022 monthly operating report filed on January 16, 2023, disclosed that the Debtor had 52 milking cows which averaged 13.99 liters per day per cow and that the Debtor was utilizing 17.35% of its milk quota. The Debtor produced for Suiza as of December 7, 2022, 9,443 liters at 90.7 cents, which resulted in $8,564.80; as of December 21, it produced 9,313 liters at 90.7 cents, which resulted in $8,446.89, as of December 28 it had milk sales which resulted in $4,223.45. The Debtor produced for Indulac as of December 7, 710 liters at 76.5896 cents which resulted in $543.78; and as of December 21, it produced 900 liters at 67.33 cents which generated $605.98 in income. The Debtor also had an income from selling hay in the amount of $6,000. During this period the operational expenses were in the amount of $10,166.53. The Debtor disclosed that the amount of $16,250 was deposited with the U.S. Clerk Bankruptcy for 5 weeks of milk assignments. The Debtor reported a net income of $849.51 for this month. The court notes that the Debtor reports $0 for utilities expenses; $0 paid on the farm lease to Juan Manuel Barreto and $1,610 paid in wages. (dkt #94, p. 16).

The Debtor's June 2023 monthly operating report filed on July 21, 2023, disclosed that the Debtor had 47 milking cows which averaged 12.62 liters per day per cow and that the Debtor was utilizing 14.14% of its milk quota. The Debtor produced for Suiza as of June 7, 2023, 6,616

liters at 90.7 cents, which resulted in $6,000.71; as of June 21, it produced 7,314 liters at 90.7 cents, which resulted in $6,633.80 as of June 28 it had milk sales which resulted in $3,316.90. The Debtor produced for Indulac as June 9, 2023, 986 liters at 84.697 cents which resulted in $835.11; and as of June 23, it produced 1,684 liters at 78.216 cents which generated $1,317.26 in income. The Debtor also had additional income from the following: (i) sale of culled cow, bull and male calf in the amount $1,530; (ii) sale of hay in the amount of $2,300; and (iii) sale of mixer in the amount of $5,000. During this period the operational expenses were in the amount of $23,368.38. The Debtor disclosed that the amount of $15,261.39 was deposited with the U.S. Clerk Bankruptcy for 5 weeks of milk assignments. The Debtor reported a net income of $45,426.49 for this month. It must be noted that in the prior month, the Debtor in its May 2023 Monthly Operating Report, disclosed that it had received $99,900 from Community Development Block Grant Disaster Recovery (CDBG-DR) Incentive funds. The Debtor also during this month purchased 37 heifers for a total cost of $44,770 (dkt # 142, p. 47). The court notes that for the month of June, the Debtor reports $0 for utilities expenses; $0 paid on the farm lease to Juan Manuel Barreto and $3,550 paid in wages. (dkt #145, p. 14).

The Court notes that the July 2023 monthly operating report only has four pages and is incomplete and missing information. (dkt #146).

***Financial analysis***

In the instant case, the Debtor has filed three (3) bankruptcy petitions. The first petition was filed on June 21, 2011. Approximately, twelve years and three months has elapsed since the Debtor's fist petition. The summation of the time the Debtor has been in bankruptcy during the course of these three petitions has been approximately eleven (11) years and three (3) months. The breakdown is as follows: (i) the first petition was filed on June 21, 2011, and dismissed on January

16, 2018 (approximately 6 years and 7 months); (ii) eleven months thereafter, the second petition was filed on December 14, 2018, and the same was dismissed on April 22, 2021. However, the Opinion and Order by which the case was dismissed was appealed and the Order Discharging Trustee was entered on July 28, 2022 (approximately 3 years and 7 months); and (iii) and less than three (3) weeks thereafter, the Debtor filed the instant petition on August 16, 2022 (approximately 1 year and 1 month). The Court notes that the secured creditor's claim in the first bankruptcy petition in the year 2011 was in the amount of $1,760,240.03 and eleven years thereafter from the filing date of the third petition, the secured creditor's claim has decreased by approximately $227,384, meaning that on average the claim has decreased yearly by $20,671.27 and a monthly amount of $1,722.61 for this claim which has been fully matured since January 12, 2015.

*Decline in the number of milking cows and utilization percentage of milk quota*

VLM in its first bankruptcy petition reported in its first monthly operating report of July 2011 which covered the period of June 24 to June 21, 2011, that it produced 44,940 liters at 85 cents which generated $38,199 in income. The July 2011 operating report did not disclose how many milking cows were being used by VLM. It provided the information for both VLM and JM Dairy, Inc. disclosing that there were in total 236 milking cows which averaged 15.48 liters per cow per day and that 57% of the milk quota was being used. During this bankruptcy petition the use of cash collateral was approved and the Debtor filed several stipulations with Banco Popular de Puerto Rico which was the secured creditor at the time. (Case No. 11-04236, dkts #19, 37, 39, 42, 61, 62, 67, 68, 91, 92, 93, 96, 123, 145, 146, 227, 231, 251). A year thereafter, VLM in its July 2012 operating report, disclosed that it had 137 milking cows which produced 16 liters per cow per day. At the time VLM was utilizing 54% of its milk quota. VLM produced 56,784 liters

at 85 cents for the month of July 2012 which resulted in $48,317.33 in income from the milk production.

During the Debtor's second bankruptcy petition, it reported in its December 2018 monthly operating report that it had 41 milking cows and that it was utilizing 8.86% of its milk quota which produced 10,403 liters that generated $8,142.29 in income. The December 2020 monthly operating report disclosed that it had 20 milking cows and that it was using 5.7% of its milk quota which produced 6,688 liters that generated $5,490.98.

The Debtor in the current bankruptcy petition reported in its August 2022 monthly operating report that it had 59 milking cows and that it was utilizing 18.16% of its milk quota which produced 21,322 liters that resulted in $17,854.52 of income. The Debtor's June 2023 monthly operating report disclosed that it had 47 milking cows and that it was utilizing 14.14% of its milk quota which produced 16,600 liters that generated $18,103.68 in income.

The Court notes that the Debtor's number of milking cows has decreased significantly (approximately 70%) from its first bankruptcy petition in which it had 137 milking cows in July 2012 to 41 milking cows in December 2018. This marked decrease in the number of milking cows resulted in the utilization of the milk quota to decrease from 54% to 8.86% and profits to dwindle from $48,317.33 to $8,142.29. In the current petition, the Debtor's number of milking cows has increased from its second bankruptcy petition from 20 milking cows to 47 milking cows. However, the number of milking cows and the milk quota utilization percentage is still well below the Debtor's first bankruptcy petition, even with the addition of the 37 heifers that were recently bought. Pursuant to the June 2023 monthly operating report, the Debtor had 47 milking cows and the milk quota utilization rate was 14.14%.

After a thorough analysis of the Debtor's dairy farm operations throughout a span of eleven (11) years and three bankruptcy proceedings, the Debtor has not been able to sustain its dairy

farm operations even in the best-case scenario which occurred during the first bankruptcy petition when it had 137 milking cows and a 54% milk quota utilization rate and the use of cash collateral from the secured creditor. The Debtor's farming operation does not generate enough income to pay for necessary operational expenses such as utilities, the rent for the use of the farmland to the Debtor's principal and a fixed salary for Debtor's principal. Therefore, if a plan is confirmed like in the first bankruptcy petition, the Debtor will not generate enough operational income to pay its operating expenses plus the monthly payments under the plan of reorganization.  Moreover, in the instant case, Luma Energy/ Puerto Electric Power Authority ("PREPA") filed proof of claim number 4-1 in the amount of $39,510.61. In the second bankruptcy petition, PREPA filed proof of claim number 1-1 in the amount of $22,294.89 and in the first bankruptcy petition it filed proof of claim number 4-1 in the amount of $21,030.19. Most importantly, the Debtor's principal has been unable to pay its commercial loan to Condado which has been fully matured since July 12, 2015, given that there is a pending and on-going foreclosure proceeding in state court in which the Debtor's principal's farmland where the Debtor runs its dairy farm business may be foreclosed in the near future. The Court is cognizant that at this juncture, the Debtor has almost no source of funding, given that almost all the monies generated from the milk assignments have been consigned with the Court until the legal issue which is currently on appeal of whether Condado's security interest milk quota extends to the milk produced and sold to milk processing plants and to the post-petition proceeds.  Notwithstanding, there is enough data over a span of eleven (11) years that evinces that in the first petition when the Debtor had access to the use of post-petition cash collateral and reached various stipulations with the secured creditor, had approximately 137 milking cows and a 54% milk quota utilization rate, the income it generated was insufficient to sustain both the farming operations and the payments under the plan.  The Court is also aware that during the first bankruptcy petition, the repayment of the mortgage notes against the real

property were also being paid under the plan. Unfortunately, back then, the consolidated Debtor was unable to generate sufficient income to pay these expenses and currently there is a foreclosure proceeding against the Debtor's principal's farmland in which the Debtor carries its dairy farm business. "Most family farm reorganizations, to be successful, will involve the sale of unnecessary property, thereby scaling down their farm operations." In re Pretzer, 96 B.R. 790, 794 (Bankr. N.D. Ohio 1989). Such is not the case in the instant petition.

Decrease in the value of personal assets and increase in the liabilities

In addition, the Debtor's personal assets have consistently decreased from bankruptcy to bankruptcy proceeding. In the year 2011, the Debtor's assets pursuant to Schedule B: Personal Property totaled $1,994,100 and were comprised mostly of the following: (i) the milk quota of 58,700 @ $21 which resulted in a value of $1,232,700; (ii) the farm animals, which at the time the Debtor listed that it had 173 cows plus 76 resting cows amongst other farm animals with a value of $575,800; and (iii) farm equipment/machinery which was valued at $158,500 (Case No. 11-05237, dkt #1, pgs. 12-13). For the year 2018, the Debtor reported in its amended Schedule A/B: Assets- Real and Personal Property disclosed that the value of the summation of its assets was in the amount of $829,212.06 and constituted mostly of the following assets: (i) the milk quota of 58,700 @ $12 which resulted in a value of $704,400; (ii) the Debtor's farm animals, which at the time it listed that it had a total of 45 milking cows, (but 32 cows had a USDA lien), amongst other farm animals with a value of $34,600; and (iii) farm equipment/machinery valued at $86,000 (Lead Case 18-07304, dkt #34, pgs. 3-4). In the year 2022, the Debtor's assets pursuant to Schedule B: Personal Property totaled $275,986.22 and were comprised mostly of the following: (i) the milk quota of 58,700/ every 2 weeks valued at $117,400; (ii) the farm animals, which at the time the Debtor listed that it had 61 milking cows amongst other farm animals with

a value of $136,700; and (iii) farm equipment/machinery which was valued at $13,950 (Case No. 22-02380, dkt #18, pgs. 4-6).

On the other side of the balance sheet, the Debtor's liabilities increased with each bankruptcy petition. In the year 2011, the total liabilities were in the amount of $1,600,033 and comprised mostly of the secured claim with BPPR in the amount of $1,475,461 which originated from the 2004 commercial loan. It listed the same as being fully secured. However, the Debtor also listed the 2004 loan in the bankruptcy of Mr. Juan Manuel Barreto as being a secured debt for the same amount ($1,475,461) and the real estate property subject to the lien was listed with a value in the amount of $1,100,000 which left $375,461 as unsecured. The Debtor reported in schedules E and F total unsecured claims in the amount of $69,911 (Case No. 11-05237, dkt #1, pgs. 15, 17-18). For the year 2018, the Debtor's total liabilities were in the amount of $2,108,855 and were comprised mostly of the secured debt owed to Condado which was in the amount of $1,619,500.29 of which the Debtor disclosed that it was secured in the amount of $1,017,400 by the value of the milk quota at the time which was $1,017,400 (58,700 @ $12) plus the value of some acres and equipment with the remainder amount of $602,100 as the unsecured portion. The Debtor also reported $475,845 in Schedule E/F: Creditors Who Have Unsecured Claims (Case No.18-07304, dkt #26, p.8 & 13). In the year 2022, the Debtor reported total liabilities in the amount of $2,179,355.92 which were constituted mostly of Condado's debt in the amount of $1,532,855.78 of which the amount of $117,400 was listed as secured by the milk quota and accounts receivables and the remainder portion in the amount of $1,415,455.78. The Debtor also disclosed SBA PR District Office having a secured claim of $104,900. The Debtor also reported $541,600.14 in Schedule E/F: Creditors Who Have Unsecured Claims (dkt #18, pgs. 9 & 14).

The Court concludes that with each bankruptcy proceeding, the value of the milk quota has decreased substantially as disclosed in the Debtor's schedules due to the decline in the

price/value of the milk quotas throughout the years. It is also important to consider that Debtor's reported gross income has decreased since its first bankruptcy petition, except for the year 2016. The gross revenues reported by the Debtor are as follows: Year 2009: $640,297; Year 2010: $674,578; Year 2011: $259,861.02 (Lead Case 11-05237, dkt #1, p. 22); Year 2016: $316,445; Year 2017: $146,309; Year 2018: Unknown (Lead Case 18-07304, dkt #26, p. 17); Year 2020: $123,218; Year 2021: $125,250; Year 2022: 01/01/22- 08/16/22: $112,589.01 (dkt #18, p. 17).

Feasibility pursuant to 11 U.S.C. §1225(a)(6)

As part of determining if there is cause to dismiss under §1208(c)(9), the court examines the Debtor's amended plan to decide whether the same is feasible pursuant to section 1225(a)(6). See In re Victorious, LLC, 545 B.R. 815, 825 (Bankr. D. Vt. 2016). Pursuant to section 1225(a)(6), the court must find that, "the debtor will be able to make plan payments under the plan and to comply with the plan" as a prerequisite for plan confirmation. 11 U.S.C. §1225(a)(6). The debtor has the burden of proving feasibility of a Chapter 12 plan. See In re Las Martas, 2022 Bankr. LEXIS 3427, *10 (Bankr. D.P.R. 2022). To determine plan feasibility, "'… the court must ascertain the 'probability of actual performance of the provisions of the plan.' Under section 1225(a)(6), the feasibility of a debtor's plan is a factual determination." Mosbrucker v. United States (In re Mosbrucker), 227 N.R. 434, 437 (B.A.P. 8th Cir. 1998) (Citations omitted). "To find that a plan is feasible, "the court must be persuaded that 'it is probable, not merely possible or hopeful, that the Debtors can actually pay the restructured debt and perform all obligations of the plan.'" Keith's Tree Farms v. Grayson Nat'l Bank, 535 B.R. 647, 652 (W.D. Va. 2015); see In re Honeyman, 201 B.R. 533, 537 (Bankr. D.N.D. 1996) (stating that a plan must be "based on realistic and objective facts as opposed to visionary or overly optimistic projections."). "The court must also consider the farm's earning power, capital structure, managerial efficiency, past

-28-

performance, and whether the same management will continue to operate the farm." In re Hughes, 2006 Bankr. LEXIS 2288, 2006 WL 2620438, *3 (Bankr. M.D.N.C. 2006).

As part of the feasibility test, the court needs to analyze the debtor's proposed plan payments based upon the debtor's projections of income and expenses and determine whether the debtor is likely to be able to make all the payments required by the plan. However, before reaching this step in the analysis, the court must first examine the debtor's projections to ensure that the same are based on the debtor's financial history. "The evidence relevant to a showing of feasibility will usually take the form of income and expense projections for the term of the plan. For most farming operations this will entail a monthly cash flow showing the timing of receipts and expenditures and indicating the debtor's ability to service the debtor's anticipated operating expenses and to make the required plan payments. The projections and expenses should be based on the debtor's past experience as supplemented by current market information. In analyzing the debtor's income projections, the court should examine whether they are consistent with the debtor's prepetition performance." Richard Levin & Henry J. Sommer 8 Collier on Bankruptcy ¶1225.02[5] (16th ed. 2023).

The Debtor's amended plan proposes to pay Condado's security in the milk quota based on the price of $5 per quart every two weeks which results in a value of $293,500 at an interest rate of 8.5%. The Court notes that pursuant to ORIL's Certification the sales price of the milk quota from the period of January 4, 2023, to May 24, 2023, ranged from $4 to $8. The Debtor's opted to value the quart at $5, which is near the low end of the price range (dkt #143, Exhibit 14). Moreover, pursuant to the Debtor's amended Chapter 12 plan dated January 10, 2023, it proposed to pay Condado $2078.96 for the first 6 months after the Effective Date and thereafter, a monthly payment of $4,224.09 for the next 96 months (dkt #93). This equates to a first yearly payment of $37,818.30 and then yearly payments thereafter in the amount of $50,869.08. These monthly

-29-

payments are just for the security interest of the milk quota, these monthly payments do not take into account the monthly payments that would be necessary to pay the mortgage note component of the commercial loan which is secured by the real estate where the business operation takes place, and which is currently undergoing foreclosure proceedings in state court. The Court understands that the real estate is owned by the Debtor's principal, but the reality is that the dairy farm operation cannot exist without the farmland, meaning that if the dairy farm operation will continue the mortgage note component of the real estate will need to be factored in. It is the Court's understanding that the monies that would pay for this secured debt would be from the Debtor's dairy farm operations and those of JM Dairy, Inc. as was the case in the first bankruptcy case. Moreover, Condado's commercial loan claim during the past 11 years has decreased by approximately $227,384, meaning that on average the debt has decreased on a yearly basis in the amount of $20,671.27 and monthly in the amount of $1,722.61 for this claim which has been fully matured since January 12, 2015. Based on Debtor's income history and the payments made towards Condado's debt, the Court finds that the amended plan is optimistic and not grounded in Debtor's financial reality for the past four years and nine months.

The Debtor's projections for the year 2023-2024 predict that there will be 88 milking cows and that the milk quota utilization rate will be 29.38% and for the year 2024-2025 it is forecasted that the Debtor will have 106 milking cows with a 35.39% milk quota utilization rate. The projected yearly income solely from milk sales for the year 2023-2024 is $376,696 ($31,391 average monthly) and a total annual income of $414,978.40 and for the year 2024-2025 the annual income solely from milk sales is estimated at $453,748 ($37,812 average monthly) and total income $499,718.40. The Court finds that these income projections are optimistic and are not based on the Debtor's past performance. For example, in the Debtor's first bankruptcy case filed on June 21, 2011, it disclosed that it initially had 173 milking cows and 76 resting cows and that

its gross income as of June 21, 2011, was in the amount of $250,861.02 (which would equate to approximately $44,269.59 gross monthly income with a total of 249 cows. The Debtor in its December 2011 operating report disclosed that VLM had 110 milking cows which averaged 12.4 liters per cow per day and that it was producing on average 19,097 liters biweekly at 85 cents with a 32.53% utilization rate for the milk quota. The income derived from the milk sales was in the amount of $24,348. If the Debtor had produced 38,194 liters for the four weeks, at the milk quota utilization rate of 32.53%, its income from milk sales would have been $32,464.90 (38,194 liters x .85) (Case No. 11-05236, dkt #101, pgs. 2-3). The Debtor in its 2023-2024 projections has 88 milking cows that average 14 liters per cow and a milk quota utilization rate of 29.38% with an average monthly milk sales income of $31,391.33. Basically, the Debtor has the same income in the December 2011 with 22 less milking cows and using 3.14% less of the milk quota utilization rate. A difference of 22 cows less would amount to approximately $7,244.16 (14 liters/cow x 84 cents x 22 cows x 28 days) less in income. The Court notes that it has used the year 2011 in which the Debtor reported the highest income (average monthly income) while in bankruptcy. Notwithstanding, the Debtor's most recent gross income numbers are far below this number. Gross income for the year 2020 was $123,218; gross income for the year 2021 was in the amount of $125,250 and for the year 2022 gross income from 01/01/22-08/16/22 was in the amount of $112,589.01. The Debtor's actual August 2023 monthly operating report discloses that it has 46 milking cows and 63 dry cows (for a total of 109 cows) and that it is utilizing 15.10% of the milk quota which produces 8,866 liters biweekly that generated $15,229.37 for this month in milk sales income. The court notes that the August monthly income is below by half the amount of the average monthly projection of $31,391.

These projections also fail to consider an important component which is the monthly payment it would have to pay Condado for its secured mortgage lien on the farmland. The

-31-

Debtor's proposed solution is that, "[i]n the event a foreclosure is in fact ordered, Mr. Barreto or Ms. Hernandez could file their own bankruptcy cases, and retain possession of the real property at issue, so that would not in any way render a plan unfeasible" (dkt #137, p. 4, ¶14). Given the Debtor's extensive history in bankruptcy, its plan to have the principals file for bankruptcy lacks foresight, since the Debtor's principals would have to formulate a plan of reorganization to repay Condado's mortgage note which they have been unable to do for the past twelve years, even at their peak when the milk quota utilization rate was at 54% and VLM had 137 milking cows. The Court concludes that the inability to repay Condado's mortgage note where the dairy farm operations take place forecloses any realistic probability of having a feasible plan of reorganization.

This is the Debtor's third bankruptcy petition, which was filed less than three weeks after the second bankruptcy case was closed, meaning that the Debtor has been almost continuously in bankruptcy for the past four (4) years and nine (9) months. The Debtor was unable to propose a timely confirmable plan pursuant to 11 U.S.C. §1208(c)(3) in its second bankruptcy proceeding and the case was dismissed. During these past four years and nine months that the Debtor has been in bankruptcy, its farming operations, despite recent optimistic projections, have barely improved. In fact, the data which this Court has thoroughly discussed evince that since the first bankruptcy petition the Debtor has been unable to sustain the dairy farm operations profitably or at least at a break-even point before consideration of debt service. The milk quota utilization rate has decreased significantly from the first bankruptcy (54%) which is the result of Debtor not having sufficient milking cows and enough cash flow to pay for the direct costs and operational expenses necessary to sustain the dairy farm operations. In the previous case, the Debtor was unable to use Condado's cash collateral because there was a legal issue as to whether Condado had a lien over Debtor's cash collateral. In the instant case, there is also a key legal issue as to

-32-

whether Condado's security interest milk quota extends to the milk produced and sold to milk processing plants and to the post-petition proceeds which was appealed and a decision on the same is pending. As discussed previously, the Debtor's financial situation has only worsened since the first bankruptcy petition and second bankruptcy petition, not only because there has been a decrease in the assets and an increase in liabilities, but most importantly because there are on-going foreclosure proceedings against the farmland which the Debtor utilizes to run its dairy farm operation. If the foreclosure proceedings are successful, there will be no farming operation. The Court finds that there has been no substantial change in circumstances from the previous case aside from increasing debts and decreasing collateral and the probability that the farmland will be foreclosed by Condado. Moreover, there is no evidence in the historical financial performance of the Debtor in which this court may rely on to determine that there is any reasonable likelihood that this Debtor may be rehabilitated. The estate has continued to diminish for the past four (4) years and nine (9) months and there is no hope of rehabilitation. The Debtors have consistently demonstrated for the past eleven years (in bankruptcy) that they do not have a viable farming operation sufficient to pay expenses and fund a plan and the value of the estate continues to diminish with the passage of time (VLM personal assets) and its liabilities continue to increase. There is also a consistent lack of payment to creditors. The Court concludes that in the instant case, the Debtor does not operate a sustainable milk producing operation which can generate enough monies to pay its operational expenses in addition to the plan payments that will need to commence upon the effective date of the plan. The court finds that the Debtor failed to meet its burden with respect to feasibility.

The Court is mindful that the Debtor's principal has been in the milk industry since 1988. However, the Debtor's financial condition has only worsened throughout the years. Condado's debt has been fully matured since January 12, 2015. The Debtor may not continue to speculate

with Condado's money. Moreover, the courts in the administration of Chapter 12 cases "… should strive to preserve [sic] this equity balance between creditors' and debtor's rights." In re Pretzer, 96 B.R. at 794 (citing 132 Cong. Rec. §10575 supra, remarks of Sen. Thurmond).

Conclusion

For the reasons previously discussed, the Court finds that dismissal is appropriate in this case based on a continuing loss to or diminution of the Debtor's estate and the absence of reasonable likelihood of rehabilitation pursuant to 11 U.S.C. §1208(c)(9). The Court also finds that the proposed amended plan of reorganization is not feasible and therefore does not comply with section 1225(a)(6). The Court's analysis as to dismissal conclude at this juncture since one ground is sufficient to dismiss a debtor's case. See In re Powell, 2022 Bankr. LEXIS 2937, at *1 n.1 (Bankr. M.D. Pa. 2022) ("Because the [m]otion to [d]ismiss is decided on the issue of bad faith, it is unnecessary to address the grounds under §1208(c)(9); Vaqueria Las Martas, Inc. v. Condado 5, LLC (In re Vaqueria Las Martas, Inc), 638 B.R. 482, 499 (B.A.P. 1st Cir. 2022) ("Because one ground is sufficient for dismissal, our analysis ends here, with the conclusion that the bankruptcy court did not abuse its discretion in dismissing the Debtor's case under § 1208(c)(1) for unreasonable delay that was prejudicial to creditors. We decline to examine the second statutory ground for the Dismissal Order, § 1208(c)(3)").

Therefore, the case is hereby dismissed.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 29th day of September 2023.

Enrique S. Lamoutte
United States Bankruptcy Judge

-34-