IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LAS MARTAS, INC.,

      **Debtor.**

CONDADO 5 LLC,

      **Plaintiff-Appellant,**

      v.

LAS MARTAS, INC.,

      **Defendant-Appellee.**

CIVIL NO. 23-1074 (RAM)

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

    Pending before the Court is Plaintiff-Appellant Condado 5 LLC's ("Condado" or "Appellant") appeal from the United States Bankruptcy Court for the District of Puerto Rico's (the "Bankruptcy Court") February 15, 2023 Opinion and Order denying Condado's *Motion to Prohibit Use of Cash Collateral and for Entry of Order Authorizing Condado to Seek and Collect Proceeds* (the "*Motion to Prohibit*"). (Bankruptcy Docket Nos. 102 and 103; Docket Nos. 1 and 1-1).[1] Defendant-Appellee and Debtor Las Martas, Inc. ("Las Martas" or "Appellee") seeks affirmance of the Bankruptcy Court's decision, adopting and incorporating the arguments made by Chapter

---

[1] All record citations in this Opinion and Order are to this Court's docket unless specified otherwise. Citations to "Bankruptcy Docket" refer to Bankruptcy Case No. 22-2380 before the Honorable Enrique S. Lamoutte of the United States Bankruptcy Court for the District of Puerto Rico.

12  Standing  Trustee-Appellee  José  R.  Carrión-Morales  (the

"Trustee"  or  "Mr.  Carrion").  (Docket  Nos.  15  and  20).  For  the

reasons  set  out  below,  the  Court  **AFFIRMS**  the  Bankruptcy  Court's

February  15,  2023  Opinion  and  Order.

## I.  PROCEDURAL BACKGROUND

This  appeal  is  the  latest  in  a  series  of  bankruptcy

proceedings  related  to  a  loan  extended  to  Las  Martas  by  Banco

Popular  de  Puerto  Rico  ("Banco  Popular"),  Condado's  predecessor  in

interest.  (Docket  No.  1-1  at  14).  The  parties  do  not  contest  the

facts  of  the  instant  case,  only  the  interpretation  and  application

of  the  relevant  law.  (Docket  Nos.  9,  15,  and  20).

### A. Underlying Dispute

To  regulate  production  in  Puerto  Rico's  dairy  industry,  the

Office  of  the  Milk  Industry  Regulation  Administrator  ("ORIL"  for

its  Spanish  acronym)  issues  licenses  to  milk  producers  that  allows

them  to  operate  dairy  farms.  (Docket  No.  15  at  6);  P.R.  Laws  Ann.

tit.  5,  §§  1101(a),  1126(f).  License  holders  are  granted  a  milk

quota,  which  is  "the  amount  of  quarts  of  milk  that  the  [ORIL]

assigns  to  milk  produces,  to  be  produced  every  fourteen  (14)  days,

in  accordance  with  the  mark's  needs."  P.R.  Laws  Ann.  tit.  5,  §

1126(c).  Dairy  producers  are  only  paid  for  the  milk  produced  within

their  allotted  quota,  and  they  are  "not  paid  for  any  milk  that  was

produced  above  that  quota  limit,"  although  extra  milk  may  be  sold

to  other  dairy  farmers.  (Bankruptcy  Docket  No.  25  at  2-3).  These

milk quotas "may be sold, leased, or used as collateral by licensed dairy farmers." In re Ruiz, 122 F.4th 1, 6 (1st Cir. 2024) (citing P.R. Laws Ann. tit. 5, §§ 1135-37); see P.R. Laws Ann. tit. 5, § 1135(a).

Las Martas is a dairy farm and milk producer in Hatillo that holds ORIL license No. 3064, with a biweekly milk quota in the amount of 58,700 quarts of raw milk (the "Milk Quota"). (Docket No. 9-7 at 20). In January 2005, Banco Popular extended to Las Martas "a credit facility in the amount of $1,850,000.00" (the "Loan"). (Docket No. 1-1 at 14). Inter alia, the Loan is secured by the Milk Quota. (Docket No. 1-1 at 14). Specifically, the relevant collateral is described as "[t]he continuous lien and security interest in favor of the Secured Creditor is constituted on 58,700 quarts of the referred quota to produce raw milk every 14 days." (Docket No. 9-7 at 20). "The entire taxed quota guarantees the amount of" $1,060,200.00 of the Loan's total balance of $1,850,00.00, "with the quota being assessed to" $18.07 for every quart. Id. Condado's security interest in the Milk Quota covers approximately 57 percent of the Loan. Id. Other collateral for the Loan "includes account receivables related to the processing plant Suiza Dairy Corp.'s ["Suiza"] acquisition by sale of raw milk from the debtor." (Docket No. 15 at 3).

The parties promptly filed a Security Agreement with ORIL, in compliance with applicable law. (Docket No. 1-1 at 14). The Loan

was to be repaid in a five-year term, but Banco Popular agreed to extend it for ten years. (Docket No. 9 at 9). It matured and became past-due and payable on January 12, 2015, over ten years ago. Id.

**B. Bankruptcy Court Proceedings**

The instant appeal arises from a series of three bankruptcy proceedings filed in connection with the Loan, all of which reached the same cash collateral issue. The first Chapter 12 Bankruptcy Petition, Bankruptcy Case No. 11-5237, was filed on June 21, 2011, and consolidated with related proceedings in Bankruptcy Case Nos. 11-5236 and 11-5239; as Bankruptcy Case No. 11-5236 was filed first, docket entries were made in this case (the "First Case"). (Docket Nos. 1-1 at 27 and 9 at 10-11). In the First Case, the Bankruptcy Court evaluated five *Stipulations for the Use of Case Collateral* (the "*Stipulations*"), finding in relevant part that: (i) Condado was "entitled to the proceeds resulting from the sale of" milk produced by Las Martas, and (ii) these proceeds constituted cash collateral as defined in the Bankruptcy Code, 11 U.S.C. § 363(a). Id. Three UCC-1 Financing Statements were also filed by Condado with the aim of perfecting its interest in the Milk Quota and extending the interest to proceeds generated by the Milk Quota, including sales proceeds from milk sold under the quota. (Docket No. 1-1 at 16-17, 19). The First Case was dismissed on January 16, 2018, for unreasonable delay prejudicial to

creditors and material default with the terms of its confirmed
plan. (Docket No. 9 at 12).

A second petition, Bankruptcy Case No. 18-7304, was filed on
December 14, 2018 (the "Second Case"). Id. Here, the Bankruptcy
Court again found that Condado had a lien over the Milk Quota, but
not the milk produced by Las Martas' cows because the Milk Quota
functioned as a production limit with value set "by market
conditions under ORIL regulations...Since Condado's collateral
does not include the cows, it may not claim that its security
interest attaches to any identifiable proceeds of the cows." Id.
at 15-16. Condado sought reconsideration of the Bankruptcy Court's
decision, which was denied. Id. at 18. Condado then appealed to
the District Court. Id. This appeal was dismissed as moot on
October 29, 2021, after the underlying Second Case was dismissed.
Id. at 18 n.1, 21. The Second Case was dismissed on April 22, 2021,
for unreasonable delay prejudicial to creditors and failure to
timely file a confirmable plan. Id. at 19-20. Las Martas appealed
this dismissal to the First Circuit Bankruptcy Appellate Panel,
which affirmed the dismissal on April 21, 2022. Id. at 20-21. The
dismissal terminated an automatic stay granted under 11 U.S.C. §
362(c)(2)(b). Id. at 21.

On March 23, 2021, Condado filed the three separate UCC-1
Financing Statements (the "Financing Statements") with the Puerto
Rico Department of State, which contained the same content as those

filed in the First Case. (Docket Nos. 1-1 at 14 and 9 at 21). These statements were approved on May 4, 2021. (Docket No. 1-1 at 14).

On August 16, 2022, Las Martas filed the instant Chapter 12 bankruptcy petition (the "Third Case"). (Docket No. 9 at 21; Bankruptcy Docket No. 1). On August 17, 2022, Condado filed the *Motion to Prohibit*. (Bankruptcy Docket No. 9). Condado claimed that the Financing Statements and the Puerto Rico Commercial Code granted Condado a secured lien over the Milk Quota, encumbering income generated from the Milk Quota pursuant to 11 U.S.C. § 552(b). Id. at 7.

On August 29, 2022, Las Martas filed a *Response*, agreeing that Condado has an attached and perfected security interest in the Milk Quota. (Bankruptcy Docket No. 15 at 1). However, Las Martas argued that Condado had no security interest in its cows, and that because milk is a product of cows, not milk quotas, Condado had no lien "on post-petition products and proceeds of the cows— the milk." Id. Condado filed a *Reply* on September 6, 2022, arguing that its security interest attaches to post-petition proceeds from the milk quotas under 11 U.S.C. § 552(b), including the milk. (Bankruptcy Docket No. 25 at 10).

A hearing on the *Motion to Prohibit* was held on September 16, 2022, with the Bankruptcy Court ordering the Trustee to file its position in writing. (Bankruptcy Docket No. 34). On September 23, 2022, the Trustee filed his *Position and Memorandum of Law in*

*Support Thereof to the Motion to Prohibit Use of Cash Collateral* (the "*Motion in Compliance*"), concluding that the Security Agreement is limited to the Milk Quota, not its proceeds or products. (Bankruptcy Docket No. 35 at 6). Condado filed a *Response* to the Trustee on October 14, 2022, arguing that Las Martas and the Trustee were judicially estopped from making their arguments in the *Response* and *Motion in Compliance* or subject to *res judicata* from Las Martas' first bankruptcy case. (Docket No. 46 at 2, 4).

On February 15, 2023, the Bankruptcy Court issued the Opinion and Order now on appeal, denying the *Motion to Prohibit*. (Docket No. 1-1; Bankruptcy Docket No. 102). The Bankruptcy Court found: (i) the doctrine of *res judicata* was not applicable; (ii) Condado's "perfected pre-petition security agreement" over Las Martas' Milk Quota was limited to the quota itself and did not extend to its proceeds or products; (iii) Condado's collateral is limited to the Milk Quota, not its proceeds, products, or profits. (Docket No. 1-1 at 28; Bankruptcy Docket No. 102). In its decision, the Bankruptcy Court concluded that 11 U.S.C. § 552(a) applied to the facts of this case instead of 11 U.S.C. § 552(b) because the Security Agreement did not contain "an express provision extending the security interest to the proceeds from a pre-petition encumbered property" and that "at the time the bankruptcy petition was filed, 'Condado did not have a property right to collect post-petition proceeds from the sale of milk.'" (Docket No. 1-1 at 22-

Case: 22-1238   Document: 00118404270   Page: 8   Date Filed: 08/04/2025   Entry ID: 6730128   Desc:
District Court Opinion and Order   Page 8 of 28
Civil No. 23-1074 (RAM)                                              8

24). The same day, Condado filed a notice of appeal on the Opinion and Order, electing for the appeal to be heard by this District Court. (Bankruptcy Docket No. 103).

## C. District Court Proceedings

Condado filed its *Appellant's Brief* on May 19, 2023, requesting this Court reverse the Bankruptcy Court's February 15, 2023 Opinion and Order and its underlying holdings. (Docket No. 9). Condado argues that the Bankruptcy Court erred twice by: (1) holding that the post-petition proceeds, products, or profits generated by Las Martas from the milk produced and sold to milk processing plants under the Milk Quota are not subject to Condado's lien; and (2) failing to enforce the *res judicata* or collateral estoppel effects of certain stipulations from Las Martas' first bankruptcy case. Id. at 18, 27.

Condado also requested oral argument pursuant to Fed. R. Bank. P. 8019(a), which this Court denies because "the facts and legal arguments of the parties are adequately presented by the briefs and record," such that the Court's decision would not be "significantly aided by oral argument." Fed. R. Bankr. P. 8019(b)(3).

The Trustee filed his *Appellee's Brief* on June 29, 2023, requesting the Court affirm the Bankruptcy Court's holdings. (Docket No. 15). Las Martas filed its *Appellee's Brief* on July 27, 2023, adopting the Trustee's arguments pursuant to Bankr. Rule

8014(e). (Docket No. 20 at 2). On August 24, 2023, Condado filed
an *Appellant's Reply Brief*, rebutting the Trustee's arguments.
(Docket No. 23).

Condado filed a *Motion to Stay* on October 10, 2023, after the
Bankruptcy Court dismissed the lead case from which the appeal was
taken and the decision, if finalized, would have left this Court
without a controversy to adjudicate. (Docket No. 24). The Court
stayed the instant case pending appeal from October 13, 2023, to
April 25, 2025. (Docket Nos. 25 and 31). The stay was lifted after
the First Circuit Bankruptcy Appellate Panel vacated the dismissal
of the lead case and remanded it to the Bankruptcy Court for
further proceedings. (Docket No. 24).

## II.    SCOPE OF APPEAL

A court reviewing a bankruptcy appeal "is 'duty-bound' to
determine its jurisdiction before proceeding to the merits, even
if not raised by the litigants." In re Nieves Guzman, 567 B.R.
854, 860 (B.A.P. 1st Cir. 2017) (citations omitted). Thus, the
Court must determine the scope of this appeal and the standard of
review applicable to any order or orders properly before the Court.
In the First Circuit, "[a]s a general rule, appellate jurisdiction
is limited to review of orders and judgments specifically described
in the notice of appeal." Biltcliffe v. CitiMortgage, Inc., 772
F.3d 925, 929 (1st Cir. 2014) (internal quotation marks and

citation omitted). Notices of appeal to a district court or Bankruptcy Appellate Panel must follow Fed. R. Bankr. P. 8003.

In its Notice of Appeal, Condado complied with Rule 8003 and specifically designated the Bankruptcy Court's February 15, 2023 Opinion and Order denying the *Motion to Prohibit* as the subject of the appeal. (Bankruptcy Docket Nos. 102 and 105). This aligns with the issues raised in the parties' filings. (Docket Nos. 9, 15, and 20). Therefore, the Court finds it has jurisdiction to review the appeal of the Bankruptcy Court's February 15, 2023 Opinion and Order.

### III.    STANDARD OF REVIEW

"On appeal from the bankruptcy court, the district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree, or remand with instructions for further proceedings." Banco Popular de P. R. v. Santiago-Salicrup, 630 B.R. 374 (D.P.R. 2021) (citing Fed. R. Bankr. P. 8013; 8 U.S.C. § 158). District courts apply a bifurcated standard of review: bankruptcy court findings of fact are reviewed for clear error and the conclusions of law are reviewed *de novo*. *See* Segarra v. Banco Popular de P.R. (In re Rivera Mercado), 599 B.R. 406, 416 (B.A.P. 1st Cir. 2019); Matter of Sport Int'l, Inc., Civil No. 04-1997, 2005 WL 8167905, at *1 (D.P.R. Sept. 8, 2005). "Clear error" review requires a "definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

## IV.        ANALYSIS

### A. The Bankruptcy Court did not Err by not Applying *Res Judicata* or Collateral Estoppel from Las Martas' First Bankruptcy Case

*Res judicata*, or claim preclusion, provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980). "Federal *res judicata* principles govern the *res judicata* effect of a judgment entered in a prior federal suit, including judgments of the bankruptcy court." <u>In re Iannochino</u>, 242 F.3d 36, 41 (1st Cir. 2001). *Res judicata* has three elements: "(1) a final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause of action in both the earlier and later suits." <u>Aunyx Corp. v. Cannon U.S.A., Inc.</u>, 978 F.2d 3, 6 (1st Cir. 1992); *see* <u>Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 37 (1st Cir. 1998).

In bankruptcy cases, finality is "more elusive" than in most other types of civil litigation. <u>In re Iannochino</u>, 242 F.3d at 43. For a bankruptcy court order to be considered "final," it "need not resolve all the issues raised by the bankruptcy[, though it] *must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief*." <u>Id.</u> at 43-44 (quoting <u>In re Integrated Res., Inc.</u>, 3 F.3d 49, 53 (2d Cir. 1993) (emphasis in original)). The order must "leave nothing to be done

with respect to the claim except the ministerial supervision of
the execution of the order." Id. at 44 (citing In re Am. Colonial
Broad. Corp., 758 F.2d 794, 801 (1st Cir. 1985)). Stipulations may
also carry *res judicata* effect. *See* Preserba Compañía De
Desarrollos, Inc. v. Condado 2, LLC, 635 B.R. 185 (B.A.P. 1st Cir.
2022).

The First Circuit has "adopted a transactional approach to
determine whether causes of action are sufficiently related to
support a *res judicata* defense." Mass. Sch. of L. at Andover, Inc.,
142 F.3d at 38 (citing Kale v. Combined Ins. Co., 924 F.2d 1161,
1166 (1st Cir. 1991)). A cause of action is "a set of facts which
can be characterized as a single transaction or series of related
transactions". Id. (quoting Apparel Art Int'l, Inc. v. Amertex
Enters., Ltd., 48 F.3d 576, 583 (1st Cir. 1995) and citing Gonzalez
v. Banco Centr. Corp., 27 F.3d 751, 755 (1st Cir. 1994)). Courts
must consider "whether the causes of action arise out of a common
nucleus of operative facts." Id. To determine if a common nucleus
of operative facts exists, the First Circuit routinely asks
"whether the facts are related in time, space, origin, or
motivation, [or] whether they form a convenient trial unit, and
whether their treatment as a unit conforms to the parties'
expectations." Id. (citing Aunyx Corp., 978 F.2d at 6 (quoting
Restatement (Second) of Judgments § 24 (A.L.I. 1982)).

In situations where multiple inconsistent final judgments

have been rendered, the latest, most recent judgment holds
preclusive effect under *res judicata*. *See* Massachusetts v.
Wampanoag Tribe of Gay Head, 98 F.Supp. 3d 55, 67 n.13 (D.Mass.
2015) (citing Restatement (Second) of Judgments § 15 (A.L.I.
1982)); In re Arroyo, No. 13-415, 2020 WL 4728098, at *5 (Bankr.
D.P.R. Aug. 13, 2020) ("When two now final and unappealable
judgments or orders are in conflict, the one last in time—not the
first—is the one entitled to res judicata effect."). This is true
even when parties present new evidence in subsequent proceedings
that might change the outcome of a claim previously decided. *See*
18 Wright & Miller's Federal Practice and Procedure § 4403 n.18
(3d ed. 2025) (noting that new evidence in subsequent proceedings
does not prevent the application of *res judicata*).

It is undisputed that the first and second elements of *res
judicata* are satisfied because there was a final judgment on the
merits in an earlier action and there is an identity of parties
between the earlier and later suits, as this issue was reached in
the previous three cases. *See* Aunyx Corp., 978 F.2d at 6; (Docket
Nos. 9; 15 and 20). However, the parties disagree over whether the
First or Second Case has *res judicata* effect on the Third Case.

Las Martas and the Trustee assert that any *res judicata* effect
from the First Case is nullified because this defense was not
raised in the Second Case. (Docket No. 15 at 28-39). Instead, they
contend it is the Second Case that would carry any *res judicata*

Case: 23-1823 Case:1:23-cv-01074-RAM Document: 00118304925 Document 9-4 Filed: 09/04/25 Filed 09/04/25 Page: 14 of 28 Entry ID: 6743541
District Court Opinion and Order   Page 14 of 28
Civil No. 23-1074 (RAM)                                              14

effect, to Las Martas' benefit. Id.

Condado argues that there was not "an identity of the cause of action" with regards to the Second Case because its facts and circumstances differ from the First and Third Cases— namely, no UCC-1 Financing Statements were filed in the Second Case. Aunyx Corp., 978 F.2d at 6; (Docket Nos. 9 and 23 at 6). In the First Case, Condado had three UCC-1 Financing Statements filed with the Puerto Rico Department of State pursuant to Puerto Rico law and had registered its lien with ORIL. (Docket No. 23 at 6). In 2021, leading up to the Third Case, Condado filed a different set of Financing Statements with contents identical to those filed in the First Case. Id. The Second Case did not contain these statements and "did *not* have a recorded pre-petition security interest via UCC because they had lapsed prior to the petition (and thus the Court did not consider any UCC liens)." Id. Condado argues this means the Second Case differed materially from the other cases and there is no *res judicata* effect from the Second Case, only from the First Case. See id. Condado never waived its *res judicata* defense from the First Case as that defense could not have been raised in the Second Case. See id. This is important because the First Case's *Stipulations* found in part that Condado was "entitled to the proceeds resulting from the sale of" Las Martas' milk production. (Docket No. 9 at 11, 33-34). If given *res judicata* effect, the *Stipulations* favor Condado on appeal. See Preserba

Compañía De Desarrollos, Inc., 635 B.R. 185.

The Court disagrees with Condado and declines to apply *res judicata* to the First Case because it does not arise from the same common nucleus of operative facts as the Second and present case. (*See* In re Juan Manuel Barreto Ginorio, Case No. 11-5236 (Bankruptcy D.P.R.)). Having reviewed the First Case, the Court agrees with the Bankruptcy Court's finding that the facts in the First Case differ so significantly from those in the Third Case that the *Stipulations* cannot be applied here. (Docket No. 1-1 at 27). Most importantly, the *Stipulations* were filed in conjunction with two other debtors whose cases were consolidated with Las Martas'; there, the debt with Banco Popular was guaranteed by collateral from all three debtors. (*See* In re Juan Manuel Barreto Ginorio, Case No. 11-5236 (Docket Nos. 39; 61; 67; 1454 and 227); Docket No. 1-1 at 27-28). The Bankruptcy Court correctly noted that this is a "critical" factual difference. (Docket No. 1-1 at 27). While Condado argues that the only cash collateral in the First Case was that in play here, the Court does not think this overrides the distinction created by the presence of multiple debtors as the *Stipulations* were (presumably) negotiated between the parties. Consequently, the First Case and its *Stipulations* do not hold *res judicata* effect in the Third Case.

However, the Second and Third Cases are sufficiently similar for *res judicata* to apply as they involve the same Loan, debtors,

creditors, and cash collateral disputes over the Milk Quota. There
are some factual differences, namely that the Second Case did not
have any UCC-1 Financing Statements and did not involve a lien
over "debtor's account receivables with Suiza Dairy, Corp."
(Docket No. 1-1 at 20). However, the factual differences are small
enough that the Second and Third Cases may be considered together
for *res judicata* purposes. Even if the First Case was sufficiently
related to the later cases as to arise from the same common nucleus
of operative fact, the last-in-time rule would prevent the First
Case from carrying any *res judicata* effect. *See* <u>Wampanoag Tribe of
Gay Head</u>, 98 F.Supp. 3d at 67 n.13. As a result, *res judicata*
attaches only to the most recent judgment rendered in the Second
Case, the outcome of which controls here.[2] *See* <u>id.</u>

## B. The Bankruptcy Court did not Err by not Applying Judicial Estoppel from the *Stipulations*

Judicial estoppel is a doctrine that "generally prevents a
party from prevailing in one phase of a case on an argument and
then relying on a contradictory argument to prevail in another

---

[2] To the extent Condado alludes to a potential collateral estoppel argument from
the First Case, the Court rejects this argument as waived for lack of development
and support. *See* L. CV. R. 7; <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st
Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some
effort at developed argumentation, are deemed waived"). At any rate, collateral
estoppel would not apply for the same reasons discussed above. *See* <u>Grella v.
Salem Five Cent Sav. Bank</u>, 42 F.3d 26, 30 (1st Cir. 1994) ("When there is an
identity of the parties in subsequent actions, a party must establish four
essential elements for a successful application of issue preclusion to the later
action: (1) the issue sought to be precluded must be the same as that involved
in the prior action; (2) the issue must have been actually litigated; (3) the
issue must have been determined by a valid and binding final judgment; and (4)
the determination of the issue must have been essential to the judgment.").

Case: 23-1803 Case: 1:22-cv-01074-RAM Document 70 Document 09/04/25 Filed 09/04/25 Page 73 of 128 Desc:
District Court Opinion and Order   Page 17 of 28
Civil No. 23-1074 (RAM)                                                                                   17

phase." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting
Pegram v. Herdrich, 530 U.S. 221, 227 n.8 (2000)). Although there
are no strict rules for judicial estoppel, the following factors
may be considered: (1) "a party's later position must be 'clearly
inconsistent' with its earlier position"; (2) "whether the party
has succeeded in persuading a court to accept that party's earlier
position, so that judicial acceptance of an inconsistent position
in a later proceeding would create 'the perception that either the
first or the second court was misled'"; and (3) "whether the party
seeking to assert an inconsistent position would derive an unfair
advantage or impose an unfair detriment on the opposing party if
not estopped." Id. at 750-51. Stipulations approved by a court may
carry judicial estoppel effect. See N.Y. Juris. Estoppel § 69,
*Effect of settlements and stipulations on judicial estoppel* (2d
ed. 2025). Judicial estoppel applies to bankruptcy proceedings.
See Peterson v. E. Bos. Sav. Bank, Civil No. 17-11776, 2018 WL
4696746, at *2 (D. Mass. Sept. 29, 2018) (citing Payless Wholesale
Distribs., Inc. v. Alberto Culver (P.R.) Inc., 989 F.2d 570, 571
(1st Cir. 1993)).

  Importantly, the Supreme Court and the First Circuit have
found that "judicial estoppel 'is an equitable doctrine invoked by
a court at its discretion.'" New Hampshire, 532 U.S. at 750
(quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)
(citation and internal quotation marks omitted). *See also* In re

Buscone, 634 B.R. 152, 167 (B.A.P. 1st Cir. 2021) (quoting New
Hampshire for the proposition that courts have discretion in
applying judicial estoppel). When deciding whether to apply
judicial estoppel, the First Circuit has indicated that the
doctrine "'should be employed when a litigant is playing fast and
loose with the courts, and when intentional self-contradiction is
being used as a means of obtaining unfair advantage in a forum
provided for suitors seeking justice.'" In re Buscone, 634 B.R. at
170 (quoting Patriot Cinemas, Inc. v. Gen. Cinemas Corp., 834 F.2d
208, 212 (1st Cir. 1987)).

After reviewing the filings in the First and Third Cases, as
well as the parties' briefings here, the Court declines to apply
judicial estoppel. As discussed above, the *Stipulations* were filed
in the First Case in 2011 and 2012 as part of a larger proceeding
involving two other debtors. (*See* In re Juan Manuel Barreto
Ginorio, Case No. 11-5236 (Docket Nos. 39; 61; 67; 1454 and 227)).
The Court does not believe Las Martas has taken inconsistent
positions in the First and Third Cases as to create a perception
that this Court or the Bankruptcy Court have been misled by Las
Martas' arguments. *See* New Hampshire, 532 U.S. at 750-51. Instead,
the Court is of the opinion that Las Martas' (as well as the
Trustee's) endorsement of the *Stipulations* over a decade ago in a
different case and context are not so inexplicably at odds with
its posture here as to trigger judicial estoppel. Had Las Martas

Case: 23-1074 Document: 00118040745 Page: 19 Date Filed: 09/04/2025 Entry ID: 6737531
Case 3:23-cv-01074-RAM Document 70-1 Filed 09/04/25 Page 19 of 28 Desc:
District Court Opinion and Order  Page 19 of 28
Civil No. 23-1074 (RAM)                                                  19

filed the *Stipulations* weeks before opposing Condado's *Motion to Prohibit*, the Court may have arrived at a different conclusion. But over a decade of intervening time between the *Stipulations* and Las Martas' *Response* to the *Motion to Prohibit*, the changed circumstances between the First and Third Cases, and the apparent lack of bad faith by any of the parties, cuts against applying judicial estoppel here. *See* <u>In re Buscone</u>, 634 B.R. at 170.

The Court could stop here and affirm the Bankruptcy Court's holding that Condado had a lien over the Milk Quota but not Las Martas' milk on *res judicata* grounds. (Docket No. 1-1 at 19-20). However, the Court continues to evaluate the parties' 11 U.S.C. § 552 arguments.

**C. The Bankruptcy Court did not Err in Finding that under 11 U.S.C. § 552, Condado's Pre-Perfected Security Agreement over the Milk Quota does not Extend to its Proceeds, Products, or Profits or Post-Petition Accounts Receivables from Suiza Dairy**

Section 552 of the United States Bankruptcy Code governs the treatment of property acquired by a debtor after the commencement of a bankruptcy case. Section 552(a) "establishes a 'general rule...that property acquired by the bankruptcy estate post-petition is not subject to any lien resulting from a pre-petition security agreement.'" <u>In re Fin. Oversight and Mgmt. Bd. for P.R.</u>, 385 F.Supp. 3d 138, 148 (D.P.R. 2019); 11 U.S.C. § 552(a). Section 552(b) creates two exceptions to this rule. *See* <u>In re Rivera Rosario</u>, Case No. 23-2291, 2023 WL 7449959, at *4 (Bankr. D.P.R.

Case: 23-1823 ECF-1074 or A270 Document09/04/25 Filed 09/04/25 09/04/25 Page 20 of 28 Desc:
District Court Opinion and Order   Page 20 of 28
Civil No. 23-1074 (RAM)                                                           20

Nov. 9, 2023) (Section 552(b) is an exception to § 552(a)'s general rule "that property acquired after the commencement of bankruptcy goes into the bankruptcy estate free and clear of any pre-bankruptcy security interests"). The exception at § 552(b)(1) is relevant here:

> if the debtor and an entity entered into a security agreement **before** the commencement of the case **and** if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, **then** such security interest extends to such proceeds, products, offspring, or profits acquired by the estate **after** the commencement of the case **to the extent** provided by such security agreement and by applicable nonbankruptcy law, **except** to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

(emphasis added). Section 552(b)(1)'s reach is limited because it "does not extend to the proceeds of property which itself is acquired after the petition date." In re Fin. Oversight and Mgmt. Bd. for P.R., 385 F.Supp. 3d at 149.

Three preconditions must be satisfied before a lien can extend post-petition through § 552(b)(1). First, there must be a valid and enforceable security agreement established pre-petition that extends to the debtor's property acquired pre-petition. See id.; (Docket No. 15 at 5). Second, the security agreement must expressly provide that the security interest extends to the "proceeds, products, offspring, or profits of such property." 11 U.S.C. §

552(b)(1); (Docket No. 15 at 5). <u>Third</u>, the security agreement
must be permitted under applicable non-bankruptcy law. *See* 11
U.S.C. § 552(b)(1); (Docket No. 15 at 5). If these conditions are
met, the parties' security agreement shall extend to post-petition
proceeds, products, offspring, or profits of the property, unless
a court orders otherwise because of "the equities of the case."
*See* 11 U.S.C. § 552(b)(1).

    *i. The Milk Quota*

    The first and third requirements of § 552(b)(1) have been
satisfied. The Security Agreement is valid, enforceable,
established pre-petition, and covers Las Martas' property acquired
pre-petition, including the Milk Quota. (Docket Nos. 1-1; 9; 15
and 20). Applicable non-bankruptcy law would permit this type of
security interest. *See* 19 P.R. Laws Ann. tit. 19, § 2234 (subject
to certain exceptions, a security agreement can provide for the
creation of a security interest in after-acquired collateral);
U.C.C. § 9-204 (allowing a security agreement to "create or provide
for a security interest in after-acquired collateral"). Only the
second requirement remains, *i.e.*, the applicable security
agreement must expressly provide that the security interest
extends to the "proceeds, products, offspring, or profits" of the
Milk Quota. 11 U.S.C. § 552(b)(1).

    The Court agrees with the Bankruptcy Court and finds the
second requirement of § 552(b)(1) is not satisfied because the

Security Agreement makes no such provision and milk quotas do not create products, profits, proceeds, or offspring. In relevant part, the Security Agreement states "[t]he continuous lien and security interest in favor of the Secured Creditor is constituted on 58,700 quarts of the referred quota to produce raw milk every 14 days." (Docket No. 9-7 at 20). A plain reading of the Security Agreement shows that Condado's security interest in the Milk Quota does not extend to any "proceeds, products, offspring, or profits" that may flow from the Milk Quota. 11 U.S.C. § 552(b)(1). This is true regardless of which party's definition of "proceeds" or "products" is applied. (Docket Nos. 9 and 15). Condado's security interest in the Milk Quota encompasses 58,700 quarts of the Milk Quota to produce raw milk every fourteen days; this describes the size of the Milk Quota and does not establish any additional rights beyond Condado's secured interest in the Milk Quota. (Docket No. 9-7 at 20). There is no mention of additional rights in any proceeds, products, or profits that may flow from the quota.

The Court's reading of the Security Agreement is supported by federal case law and Puerto Rico statutes that treat milk quotas as standalone assets and collateral. For example, in the Matter of Hernández Arvelo, the debtors' milk quota was described as an "asset" in its own right and was listed as part of the debtors' dairy operation alongside the dairy farm, structures, cows, machinery, and milk license. *See* 125 B.R. 693, 694 (Bankr. D.P.R.

1991). There was no mention of any proceeds or products flowing from the quota. *See* id. The First Circuit has recently stated that "[m]ilk quotas may be sold, leased, or used as collateral by licensed dairy farmers," making no mention of any products, proceeds, or profits attached to such a quota. In re Ruiz, 122 F.4th at 7. Indeed, In re Ruiz dealt with an auction of the appellee's milk quota and repeatedly referred to the quota as "property of [the appellee's] bankruptcy estate" and as an individual asset with standalone value. Id. at 12. There was no indication the milk quota was viewed as being attached to any additional asserts, such as milk produced or sold under the quota. Id. at 12-13.

The independent value of milk quotas is reflected in Puerto Rico law. Milk producers are permitted to lease their milk quotas up to a maximum of 5,000 quarts of milk every fourteen days, provided both the lessor and lessee are licensed dairy operators. *See* P.R. Laws Ann. tit. 5, § 1136; Rosa Dairy Farm, Inc., 622 B.R. 806, 814 (1st Cir. B.A.P. 2020) (discussing how milk quotas may be leased). Section 1136 thus reiterates that milk quotas function as assets separate from the actual milk produced and sold under the quotas. None of the materials reviewed by the Court supports Condado's conclusion that the Security Agreement covers any products or proceeds of the Milk Quota as the Milk Quota functions only as a right to enter the dairy market. As aptly stated by the

Bankruptcy Court, "milk is a product of cows, not quotas." (Docket No. 1-1 at 19).

Condado argues that because a "milk quota" is defined as "[t]he amount of quarts of milk that the [ORIL] assigns to milk producers, **to be produced every fourteen (14) days**, in accordance with the market's needs," the Puerto Rico legislature intended a milk quota to encompass the actual milk produced and sold under the quota. (Docket No. 9 at 25) (emphasis in original). The Court disagrees with Condado's interpretation. The Milk Quota is a license to sell a certain amount of milk that is produced every two weeks; the value of the quota is that it gives the holder a right to tell.

Because the milk quota can be sold or leased to third parties, it is not inextricably tied to Las Martas' milk production so as to fall under the scope of Section 552(b). The wording relied on by Condado merely outlines the parameters under which the amount of milk that may be sold within any one time under the Milk Quota may be calculated. Las Martas owns cows, the cows produce milk, and *because* of its Milk Quota, Las Martas has the right to produce and sell 58,700 quarts of milk produced every fourteen days. (Docket No. 9-7 at 20). The right to sell embodied in the Milk Quota is what provides the $1,060,200.00 in value for the Loan, as without the Milk Quota, Las Martas could not enter the market and sell its milk. Id. Should any party with rights in the Milk Quota

seek to sell it, the Milk Quota could be sold for a significant
profit because it would give a new buyer the same right to
participate in the market. *See* <u>In re Ruiz</u>, 122 F.4th at 6.

Moreover, the language in Condado's UCC-1 Financing
Statements does not support its arguments. For example, Condado
argues these statements encumber "[t]he amount of 58,700 quarts of
quota to produce raw milk every 14 days." (Docket No. 1-9 at 15).
This does not give Condado the rights in 58,700 quarts of milk
produced under the Milk Quota, it defines the scope of the Milk
Quota and shows why the Milk Quota has such a high value— it gives
the holder the ability to sell a large amount of milk on the open
market.

In accordance with the above, the Court affirms Bankruptcy
Court's finding that "Condado's perfected pre-petition security
agreement over debtor's milk quota is limited to the milk quota,"
not any proceeds or products it may carry. (Docket No. 1-1 at 22).
As no exception from § 552(b) applies, the general rule under §
552(a) blocks Condado from obtaining any post-petition proceeds,
products, or profits generated by Las Martas when selling milk
under the Milk Quota.

*ii. Suiza's account receivables*

The Court briefly turns to the issue of Las Martas' post-
petition account receivables with Suiza. The Court is uncertain
why Las Martas' relationship with Suiza is detailed separately

Case: 23-1074   Document: 00118304725   Page: 26   Date Filed: 09/04/2025   Entry ID: 6745831

Case: 23-1074   Doc#: 20-1   Filed: 09/04/25   Entered: 09/04/25 17:25:37   Desc:
District Court Opinion and Order   Page 26 of 28

Civil No. 23-1074 (RAM)                                                            26

from its general right to sell under the Milk Quota. However, the

language in the applicable UCC-1 Financing Statement clearly

states that Las Martas has granted to Condado a lien and security

interest:

> On the existing accounts receivable related to the
> processing plant Suiza Dairy, Corp., and those
> that may be acquired subsequently or in the future
> by the Debtor due to the payment for the sale of
> raw milk to the aforementioned processing plant,
> in accordance with payment settlement every 14
> days, the preferred payment will be of USD
> 7,450.00 fortnightly, over 118 fortnights.

(Docket No. 1-9 at 10). In contrast to the UCC-1 Financing

Statements' language about the Milk Quota, this statement includes

the assets claimed by Condado. As previously stated, the first two

requirements of § 552(b)(1) have been satisfied and are

uncontested. The Security Agreement is valid, enforceable,

established pre-petition, and covers Las Martas' pre-petition

property. (Docket Nos. 1-1; 9; 15 and 20). Applicable non-

bankruptcy law allows this type of security interest. *See* 19 P.R.

Laws Ann. tit. 19, § 2234; U.C.C. § 9-204.

However, the third requirement has not been met. Section

552(b)(1) requires that an applicable security interest created by

a security agreement must extend to pre-petition property of the

debtor and "proceeds, products, offspring, or profits of such

property." 11 U.S.C. § 552(b)(1). There is no pre-petition property

as Condado is attempting to stake an interest in post-petition

sales transactions of post-petition acquired property. Milk produced post-petition sold to Suiza in the future cannot be said to have existed at the time the Third Case (or any previous case) was filed. As Condado does not have a secured interest in pre-petition property that would result in post-petition proceeds under § 552(b), its interest from Suiza is subject to § 552(a).

The Court agrees with the Bankruptcy Court and Trustee that permitting Condado's interest here would fly in the face of the general rule established at § 552(a). (Docket Nos. 1-1 and 15); *see also* In re Cross Baking Co., Inc., 818 F.2d 1027, 1032 (1st Cir. 1987) ("post-petition receivables generally do not constitute "proceeds" of pre-petition receivables under section 552(b)"). Condado cannot claim an interest in accounts receivables with Suiza under section 552(a) because "property acquired by the bankruptcy estate post-petition is not subject to any lien resulting from a pre-petition security agreement.'" In re Fin. Oversight and Mgmt. Bd. for P.R., 385 F.Supp. 3d at 148.

### V.     CONCLUSION

For the foregoing reasons, the Court hereby **AFFIRMS** the Bankruptcy Court's Order of February 15, 2023. Judgment shall be entered accordingly.

Case: 23-1823 Document: 00118374125 Page: 28 Date Filed: 09/04/2025 Entry ID: 6747231
Case: 3:23-cv-01074-RAM Document: 70 Filed: 09/04/25 Page: 28 of 28 Desc:
District Court Opinion and Order   Page 28 of 28
Civil No. 23-1074 (RAM)                                                        28

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 4th day of September 2025.

                              s/Raúl M. Arias-Marxuach
                              UNITED STATES DISTRICT JUDGE